```
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
                   FORT PIERCE DIVISION
                 CASE NO.  22-141012-CR-CANNON


UNITED STATES OF AMERICA,
                                         MAY 20, 2022.
             Plaintiff,
     vs.                                 FORT PIERCE, FLORIDA

KWUAN MONTRELL BAKER,
                                         PAGES 1 - 97
             Defendant.          /
     _____
```

```
                 TRANSCRIPT OF MOTION TO SUPPRESS
             BEFORE THE HONORABLE AILEEN M. CANNON
                 UNITED STATES DISTRICT JUDGE
```

<u>APPEARANCES:</u>

```
FOR THE GOVERNMENT:          LUISA BERTI, AUSA
                             MICHAEL PORTER, AUSA
                             Office of U.S. Attorney
                             101 South U.S. Hwy 1
                             Fort Pierce, Florida  34950


FOR THE DEFENDANT:           PANAYOTTA AUGUSTIN-BIRCH, AFPD
                             Office of U.S. Public Defender
                             109 North Second Street
                             Fort Pierce, Florida  34950




REPORTED BY:                 DIANE MILLER, RMR, CRR
                             Official Court Reporter
                             Unites States District Court
                             101 South Highway 1
                             Fort Pierce, Florida  34950
                             diane_miller@flsd.uscourts.gov
                                 I-N-D-E-X
```

<u>WITNESSES</u>                                           <u>PAGE</u>

DEPUTY SHERIFF EVAN RIDLE

 Direct Examination by Ms. Berti                  5

 Cross-Examination by Ms. Augustin-Birch         44

 Redirect Examination by Ms. Berti               62

 Recross-Examination by Ms. Augustin-Birch       76

<pre>
 1                        P-R-O-C-E-E-D-I-N-G-S
 2              THE COURT:  Thank you; you may be seated.
 3              THE COURTROOM DEPUTY:  Calling case 22-CR-14012, USA
 4     versus Kwuan Montrell Baker.  Can we have the parties enter
 5     appearances beginning with the government, please.
 6              MS. BERTI:  Good morning, Judge, Luisa Berti on
 7     behalf of the United States.  I am seated here at counsel table
 8     with Special Agent Nicole Callahan with ATF and with Michael
 9     Porter, also from the U.S. Attorney's Office.
10              THE COURT:  Good morning.
11              MS. AUGUSTIN-BIRCH:  Good morning, Your Honor;
12     Panoyotta Augustin-Birch on behalf of Kwuan Baker, and he is
13     present before the Court.
14              THE COURT:  Good morning, Ms. Birch; and good
15     morning, Mr. Baker.
16              Masks are optional, for anybody who wishes to remove
17     them.
18              All right.  We are here on defendant's motion to
19     suppress Docket Entry 20.  I have reviewed the motion, the
20     opposition, along with the factual proffer submitted at the
21     detention hearing, and the entire record.  I have also taken a
22     look at the various state cases cited by the defendant and
23     responded to, in part, by the Government.
24              So, Ms. Berti, how do you wish to proceed?
25              MS. BERTI:  I would like to call a witness from the
</pre>

```
 1   St. Lucie County Sheriff's Office.

 2           THE COURT:  All right.  And just for overall planning

 3   purposes, how many witnesses do you have for today, and how

 4   many total exhibits?

 5           MS. BERTI:  I have two witnesses present, I don't

 6   know if I'll need both of them, but definitely one.  I have two

 7   total exhibits.

 8           THE COURT:  And the name of your first witness?

 9           MS. BERTI:  Deputy Evan Ridle from the St. Lucie

10   County Sheriff's Office.

11           THE COURT:  How do you spell the last name?

12           MS. BERTI:  R-I-D-L-E.

13           THE COURT:  Okay.  And have you queued up your

14   exhibits, if there is any video recording?  I believe there is.

15           MS. BERTI:  We did test them this morning in court.

16           THE COURT:  Okay.  And I assume you have shared all

17   of those materials with Ms. Birch.

18           MS. BERTI:  I have turned them over, they were also

19   provided in discovery.

20           THE COURT:  Okay.

21           MS. AUGUSTIN-BIRCH:  That's correct, Your Honor.  I

22   would only ask the Court to invoke the rule.

23           THE COURT:  All right.

24           The rule is so invoked.  Which witness is going to be

25   going first, Mr. Ridle, I assume?
```

```
 1              Okay, all right.  Ms. Berti, you may call your first
 2   witness.
 3              MS. BERTI:  At this time, the United States calls
 4   Deputy Evan Ridle with the St. Lucie County Sheriff's Office.
 5              DEPUTY EVAN RIDLE, GOVERNMENT WITNESS, SWORN.
 6              THE COURTROOM DEPUTY:  Can you please state your name
 7   and spell your last name?
 8              THE WITNESS:  Evan Ridle, R-I-D-L-E.
 9              THE COURT:  You may be seated.
10                        DIRECT EXAMINATION
11   BY MS. BERTI:
12   Q    Good morning, sir, where do you work?
13   A    The St. Lucie County Sheriff's Office.
14   Q    How long have you worked there?
15   A    Approximately five years.
16   Q    And what unit are you assigned to with the St. Lucie County
17   Sheriff's Office?
18   A    The Special Investigations Section, Narcotics, Vice
19   Division.
20   Q    Do you know approximately how many members there are in the
21   Narcotics Unit or the Vice Division?
22   A    There is approximately eight members.
23   Q    Do you frequently or do you always work cases together?
24   A    We do.
25   Q    Okay.  We are here today to discuss the traffic stop that
```

1    is at issue in this case, the traffic stop of someone by the

2    name of Jordan Kane.  Prior to April 6th of 2021, did you know

3    who Jordan Kane was?

4    A    I did.

5    Q    Did you know what kind of car or cars he drove?

6    A    I did.

7    Q    What kind of vehicles were those?

8    A    The first vehicle that he was seen in was a white Jeep SUV,

9    but his typical vehicle that he drove was a Chevy Silverado.

10   Q    How were you aware of vehicles he drove?

11   A    Based on previous experiences with him, as well as the

12   Silverado had a specialty tag as well as dents and stuff in the

13   truck which made it stick out.

14   Q    Had he previously been arrested for various drug cases in

15   St. Lucie County?

16   A    He has.

17            MS. AUGUSTIN-BIRCH:  Objection, Your Honor, as to

18   relevance, as to what Mr. Kane may have been arrested to.  It

19   has no bearing on the motion to suppress regarding Mr. Baker.

20            THE COURT:  Overruled.

21   BY MS. BERTI:

22   Q    Had Mr. Kane previously been arrested for various different

23   drug cases in St. Lucie County?

24   A    Yes.

25   Q    Who had arrested him?

1   A    Both myself, Deputy Tomaszewski, and Deputy Durin.

2   Q    Okay.  In 2021, specifically last year, what was the date

3   of the first time that he was arrested by the Sheriff's Office?

4        MS. AUGUSTIN-BIRCH:  Your Honor, again, I would

5   object to the line of questioning, in regards to Mr. Kane's

6   previous arrest.  I would submit to the Court that we should

7   focus on the stop of the vehicle on April 6 of 2021.

8        THE COURT:  Mrs. Berti, what is your response?

9        MS. BERTI:  I think his prior arrest for drug

10  violations are highly relevant, based on the totality of the

11  circumstances and why the deputy ultimately stopped him on

12  April 6th of 2021.

13       THE COURT:  All right.  I'll overrule the objection.

14  You may continue.

15  BY MS. BERTI:

16  Q    What was the date of the first time he was arrested, in

17  2021?

18  A    It was 1/20 of 2021.

19  Q    Okay.  What were the circumstances of that arrest?

20  A    Deputy Durin had been called to an unwelcome person at a

21  business.  While making contact with Jordan Kane, she

22  established probable cause for arrest for the crimes of

23  possession of a controlled substance without a prescription, as

24  well as possession of narcotic paraphernalia.

25  Q    You mentioned there was a deputy who was called out to a

1   business for an unwelcome person at the business and then you

2   referenced Jordan Kane.  Jordan Kane was the person that law

3   enforcement was called about, correct?

4   A   Yes, ma'am.

5   Q   And what -- you mentioned that there -- there was an arrest

6   that day for some narcotics violations.  What was it that

7   deputy -- the deputy observed in Mr. Kane's vehicle that caused

8   him ultimately to arrest him?

9   A   Referring back to my report -- or back to Deputy Durin's

10  report --

11          THE COURT:  Can you speak closer to the microphone?

12          THE WITNESS:  Yes, ma'am, sorry.

13          When Deputy Durin had Kane step out of the vehicle,

14  she could see in plain view two needles and a spoon that had

15  burn marks on it.

16  BY MS. BERTI:

17  Q   Okay.  Did she locate any actual narcotics inside the

18  vehicle or any other indicia of drug paraphernalia?

19  A   She located a baggy containing two unidentified pills in

20  his right front pocket.

21  Q   Okay.  And was there additional drug paraphernalia located

22  in the vehicle?

23  A   There was also crystal-like rock substance near the left

24  side of the gear shifter along with small crystal-like rock,

25  where the unidentified pills, same as the one found on Kane.

1   I'm sorry, the small crystal-like rock were three unidentified

2   pills same as the ones found on Kane.

3   Q    Okay.  Pursuant to, I guess, an inventory search of the

4   vehicle, do you know whether or not the deputy actually

5   observed additional capped needles in the backseat of the

6   vehicle or any additional burned spoons?

7   A    It looks like the deputy also located two more burnt

8   spoons -- and excuse me for one moment -- so the deputy, while

9   inventorying the vehicle, also located buprenorphine

10  hydrochloride, which is a prescription-only medication.

11  Q    Okay.  Subsequent to that arrest on January 20th of 2021,

12  was Mr. Kane arrested again or did he again encounter law

13  enforcement?

14  A    Yes.

15  Q    What date did that occur on?

16  A    That would be 1/22 of '21.

17       MS. AUGUSTIN-BIRCH:  Your Honor, again, I would

18  object to this line of questioning in regards to Mr. Kane's

19  prior arrest as it has no bearing on the traffic stop of

20  April 6th of 2021.

21       THE COURT:  And why wouldn't they be relevant to the

22  officer's understanding of the circumstances at hand?

23       MS. AUGUSTIN-BIRCH:  Your Honor, anything that

24  occurred in January or anything prior to April 6th, it's almost

25  like the Government is making this argument that there is like

 1    a continuing probable cause.  I'm not sure what the angle is,

 2    just in listening to the testimony, he is testifying to facts

 3    from specific arrests that happened several months prior to the

 4    date in question which is April 6th of 2021.

 5            THE COURT:  Ms. Berti, what is your response focusing

 6    on Ms. Birch's objection?

 7            MS. BERTI:  The person in question who was operating

 8    the motor vehicle in this case is Jordan Kane, not Mr. Baker.

 9    The deputies, in stopping Mr. Kane on the day in question,

10    stopped him as a result of him weaving, but because they also

11    believed, based on all of their prior interactions with him,

12    that he was potentially under the influence of narcotics.

13            THE COURT:  All right.  I think there has been a

14    sufficient showing of relevance for the information, and it is

15    information that could be considered as part of the totality of

16    the circumstances leading up to the basis for the stop which is

17    at issue, and I think it would be artificial to completely

18    eliminate and extricate anything that happened prior to

19    April 6th.

20            You may continue.

21    BY MS. BERTI:

22    Q   On January 22nd of 2021, can you briefly explain to the

23    Court what the circumstances were of that arrest?

24    A   So that arrest was conducted by Deputy Tomaszewski, that is

25    when Jordan Kane was driving a white Jeep and surveillance was

```
 1    established on his vehicle, and as in doing such, the vehicle

 2    was observed driving at a high rate of speed, on 6th Street,

 3    and at the intersection of Parkway and 6th Street, the Jeep

 4    again ran a stop sign.  As units were responding to the area,

 5    traffic came to a stop at the intersection of Virginia Avenue

 6    and Sunrise.  When deputies and detectives from the Special

 7    Investigations Section initiated the traffic stop, Mr. Kane

 8    attempted to flee which he was unable to do because we were

 9    able to block his vehicle in.

10    Q    What, if any, contraband or controlled substances were

11    located as a result of that traffic stop?

12    A    A marijuana blunt that field tested positive for MDMA,

13    which is Molly -- "Molly" is the street name for MDMA -- and

14    when the vehicle was stopped, Kane threw the MDMA cigarette,

15    marijuana blunt, and attempted to conceal and destroy the item,

16    all in the presence of multiple deputies.

17    Q    Were there additional capsules located on Mr. Kane?

18    A    Yes, there was.  There was white crystal-like rocks and

19    capsules with brown powder.

20    Q    And were the capsules later field tested?

21    A    They were, they field tested positive for MDMA and

22    fentanyl.

23    Q    And you mentioned that Deputy Tomaszewski was involved in

24    this arrest, or I guess was the arresting officer on this case.

25    Is that the same deputy Tomaszewski that ultimately arrested
```

```
 1   Mr. Kane again on April 6, 2021?

 2   A   Yes, ma'am, it is.

 3            THE COURT:  Can we go with the names again?  The name

 4   of that deputy in reference to the January 22 arrest, how do

 5   you spell his name?

 6            MS. BERTI:  You are asking the Government.  It's

 7   T-O-M-A-S-Z-E-W-S-K-I, the first name is Daniel, D-A-N-I-E-L.

 8            THE COURT:  All right, you may continue.

 9   BY MS. BERTI:

10   Q   As a result of those or I guess that first case and then

11   that secondary case, do you know whether or not the state court

12   judge issued a bench warrant for an arrest for Mr. Kane?

13   A   He did.

14   Q   And were you and/or your unit assigned to execute that

15   bench warrant or that arrest warrant?

16   A   We were.

17   Q   What day was it that you ultimately found Mr. Kane and

18   arrested him on that bench warrant?

19   A   February 2, 2021.

20   Q   Just briefly explain to the Judge how it was that you

21   received that warrant and how it was that you executed that

22   warrant?

23   A   Our unit obtained information that Jordan Kane had the

24   arrest warrant out for him.  Detective Osteen and I were

25   driving in the area near Kane's residence where we located his
```

```
 1   vehicle driving --

 2   Q   I'm going to interrupt you for one second, Deputy Osteen,

 3   who you just mentioned, I believe that's O-S-T-E-E-N, correct?

 4   A   Yes, ma'am.

 5   Q   Was he also involved in the April 6, 2021, arrest of

 6   Mr. Kane?

 7   A   Yes, he was.

 8   Q   Okay, go ahead.

 9   A   So we observed him pull into 1200 West Midway Road, which

10   is the Metro gas station, and we initiated a traffic stop on

11   his vehicle.

12   Q   And you were ultimately able to execute the Judge's arrest

13   warrant in that case, correct?

14   A   We were.

15   Q   As a result of stopping him and executing that arrest

16   warrant, did you also end up developing new charges for him on

17   that date?

18   A   I did.

19   Q   And what were the circumstances of that arrest, which I'm

20   referring to but which is actually your arrest, correct?

21   A   Yes, ma'am.

22   Q   What were the circumstances of that arrest?

23   A   So when I had Mr. Kane step out of the vehicle, I could see

24   in plain view inside of the door pocket a small baggy that

25   contained a white powdery substance which later field tested
```

1    positive for MDPV/Molly.

2    Q    What else, if anything, did you observe?

3    A    A subsequent search of the vehicle, based on the probable

4    cause established by finding the drugs in plain view, revealed

5    a cigarette pack in the center console of the vehicle that

6    contained a clear baggy holding a small white rock which field

7    tested positive for MDPV/Molly, again.

8    Q    Okay.

9    A    Next to the cigarette pack was a Chapstick tube which

10   contained one capsule that field tested positive for fentanyl.

11   Q    And.  Did you find any narcotics paraphernalia in the

12   vehicle?

13   A    There was several needles inside the vehicle and two used

14   spoons that had burn marks on them as well.

15   Q    Okay.  I think you may have mentioned this, but was Deputy

16   Tomaszewski also present for this arrest on February 2nd of

17   2021?

18   A    He was.

19   Q    Okay.  After the February 2, 2021, arrest, did you again

20   encounter Mr. Kane out and about on a public street?

21   A    We did.

22   Q    What date was that?

23   A    February or -- I'm sorry, I don't have that report in front

24   of me, but it was the 6th of April, I believe.

25   Q    Okay.  That's ultimately the day that the traffic stop

```
 1  occurred that we are here to discuss, correct?

 2  A    Yes, ma'am.

 3  Q    Okay.  Between February 2nd of 2021 and then ultimately the

 4  arrest that occurred in this case, April 6th of 2021, do you

 5  know whether or not Mr. Kane was being drug tested pursuant to

 6  his criminal court cases?

 7  A    He was.

 8       MS. AUGUSTIN-BIRCH:  Your Honor, I would object to

 9  questioning as to whether Mr. Kane was being drug tested prior

10  to April 6th based on the same objections that I have made

11  previously.

12       THE COURT:  I'll overrule the objection again on the

13  basis that in the totality of the circumstances, it could be

14  relevant to law enforcement, whether they had a reasonable

15  belief that the operator of the vehicle was under the

16  influence.

17       You may continue.

18  BY MS. BERTI:

19  Q    How did you know that he was being drug tested?

20  A    Through his probation officer, Kristin Callahan [phonetic].

21  Q    Okay.  And explain to the Court how it was that you came to

22  know that he was being drug tested, what was the relationship

23  that you had with his probation officer or his pretrial

24  services officer, Ms. Callahan?

25  A    Ms. Callahan has a good working relationship with our unit,
```

1    and when she has one of her clients who fails a drug test, she

2    believes they are using drugs still or somebody is selling

3    narcotics out of their residence, she will notify us of that

4    person and notify us of what she has heard.

5    Q    What exactly did she inform you about Jordan Kane

6    specifically?

7    A    She had informed us that Jordan Kane had failed a drug test

8    and that he was reported to show up for a drug test the day

9    prior, so that would have been the 5th, and that Jordan Kane

10   did not show up on that day.

11   Q    Okay.  Did she know anything about his living situation or

12   any possible narcotic activity that was occurring where he

13   lived?

14   A    She believed that somebody that is living with Jordan Kane

15   was also selling narcotics.

16   Q    Okay.  And do you know whether or not Deputy Tomaszewski

17   also received this information from Ms. Callahan?

18   A    Yes, he did.

19   Q    So based on the conversations that you had with the

20   probation officer, the conversations that Deputy Tomaszewski

21   had with the probation officer, did you have reason to believe

22   that Mr. Kane was potentially using narcotics?

23   A    Yes.

24   Q    Okay.  Did both yourself and Deputy Tomaszewski encounter

25   Mr. Kane on April 6, 2021?

1    A    We did.

2    Q    How and where did that happen?

3    A    So Deputy Tomaszewski alerted us via the radio that he had

4    observed Jordan Kane's vehicle, and had started surveillance on

5    his vehicle.

6    Q    So what was going on that day?  Why was it that that

7    particular vehicle came to the attention of Deputy Tomaszewski?

8    Why was that relevant to the Narcotics Unit?

9    A    Because knowing that Jordan Kane frequently uses narcotics,

10   knowing that he had recently failed a drug test, we believed

11   that he would be either going to pick up narcotics or doing --

12   doing -- every time we have dealt with him, he has had

13   narcotics in his vehicle, so he is somebody that is on our

14   radar.

15   Q    Let me ask you this as well.  You mentioned, obviously, you

16   have been involved in arrests that he was arrested at.  Did you

17   ever actually observe him yourself personally to be under the

18   influence of narcotics?

19   A    Yes.

20   Q    And I'm assuming that was at the arrest?

21   A    Both times subsequent to his arrest, he exhibited the

22   classic signs of somebody using opioids where they begin

23   nodding off, unable to hold their attention.

24   Q    Okay.

25              THE COURT:  So that was when you saw him on

1    February 2, 2021?

2            THE WITNESS:  Yes, ma'am.

3    BY MS. BERTI:

4    Q    And you said that Deputy Tomaszewski essentially decides to

5    try to conduct or to conduct surveillance on him.  What did

6    that mean?  What does that entail when that happened?

7    A    So he radioed to us that he wanted us to follow the

8    vehicle, so in doing so --

9    Q    When you say "us" -- I am sorry to interrupt you -- who are

10   you talking about?

11   A    Our unit, our Special Investigations Section, Narcotics

12   Division.  So we set up perimeter -- or set up surveillance, we

13   all drive unmarked vehicles.  We were all in our own vehicles

14   at that time.

15   Q    Okay.  So when you say you "set up a perimeter," what does

16   that mean?

17   A    We set up in the area to where we could observe Mr. Kane

18   and where he was going.

19   Q    Okay.  And you said you are all in unmarked vehicles,

20   correct?

21   A    Yes, ma'am.

22   Q    Okay.  When you are speaking with each other, you are doing

23   that over a police radio?

24   A    Yes.

25   Q    Okay.  And are all of the deputies or detectives in the

```
 1  Narcotics Unit on the same radio frequency on that police
 2  radio?
 3  A   We are.
 4  Q   And do you know whether or not the police radio from this
 5  particular case, from this April 6th case was preserved?
 6  A   It was.
 7  Q   Have you had an opportunity to review and listen to the
 8  recording of that police radio?
 9  A   I have.
10  Q   Okay.  And I'm going to --
11          MS. BERTI:  May I approach the witness?
12          THE COURT:  You may.
13  BY MS. BERTI:
14  Q   I'm going to show you what's marked as Government's Exhibit
15  Number 1 and just ask you if you recognize this exhibit?
16  A   Yes.
17  Q   Okay.  And is this a copy of the exhibit that you
18  previously listened to of that police radio?
19  A   It is.
20      (Evidence identified as Government Exhibit No. 1)
21          MS. BERTI:  At this time, Judge, the Government would
22  move into evidence what is marked for identification as
23  Government's Exhibit 1.
24          THE COURT:  Any objection to admission of
25  Government's 1?
```

```
 1              MS. AUGUSTIN-BIRCH:  No, Your Honor.

 2              THE COURT:  Government's 1 is admitted without

 3    objection.

 4         (Evidence admitted as Government's Exhibit No. 1.)

 5              MS. BERTI:  And I'm going to ask the Court if I can

 6    actually publish this, sort of as a portion of this direct

 7    examination.

 8              THE COURT:  Any objection?

 9              MS. AUGUSTIN-BIRCH:  No, Your Honor.

10              THE COURT:  You may.

11              MS. BERTI:  May I return to counsel table to do so?

12              THE COURT:  Yes.

13         (Audio recording played in open court.)

14    BY MS. BERTI:

15    Q   Okay, I'm going to pause this and play it.

16              Can I ask a few questions specifically about sort of

17    the playback of this?

18              This recording in total -- or I guess the relevant

19    portions that the Government would ask to publish to the Court

20    is about 11-and-a-half minutes.  What is the actual totality of

21    the time that that surveillance occurred on April 6th of 2021?

22    A   I would say approximately 45 minutes.

23    Q   Okay.  And so why is the audio recording, the relevant

24    portion anyway, much shorter than the time that you actually

25    were observing him?
```

```
 1  A   Because those are the times that we are speaking on the
 2  radio.
 3  Q   All right.  So how does the radio work when it comes to
 4  recording?
 5  A   So it is push to talk, it only records when one of us keys
 6  up our microphone and then that's what is recorded.  It doesn't
 7  record while we are not physically pushing the button on the
 8  microphone to speak.
 9  Q   Okay.  And so when we are hearing the deputies talking here
10  on the radio, is it there are parts where there is a
11  substantial time gap; is that correct?
12  A   Yes.
13  Q   Okay.
14      (Audio recording played in open court.)
15  BY MS. BERTI:
16  Q   I'm going to pause that for a second.
17          Who is speaking in that particular instance on the
18  record?
19  A   Deputy Tomaszewski and Detective Osteen.
20  Q   And you hear him say he pulled into a smoke shop.  Who is
21  he referring to?
22  A   Jordan Kane.
23  Q   What does that mean, a "smoke shop"?  Where was Mr. Kane?
24  A   Smoke shops sell typically tobacco products, bongs, things
25  like that that are meant to be used for tobacco.  They sell
```

```
 1    things like detox equipment to help pass drug tests and things

 2    of that nature.

 3    Q    And where were you at the time that Deputy Tomaszewski

 4    observes Mr. Kane inside of that smoke shop?

 5    A    I don't recall my exact location at that time, but I was

 6    driving towards his direction.

 7    Q    Okay.  So you are driving to sort of get involved and

 8    participate in the surveillance?

 9    A    Yes.

10    Q    Do you know approximately how long Mr. Kane stayed in the

11    smoke shop?

12    A    I believe it was less than five minutes.

13    Q    Okay.

14         (Audio recording played in open court.)

15    BY MS. BERTI:

16    Q    Deputy Tomaszewski is calling out various cross streets.

17    What is happening during that time?

18    A    He is directing us into the area where Jordan Kane is at so

19    that way we can establish physical surveillance of him in his

20    vehicle.

21              THE COURT:  What is that general area?

22              THE WITNESS:  Okeechobee and 21st Street, in Fort

23    Pierce.

24              THE COURT:  Okay.

25         (Audio recording played in open court.)
```

Friday, May 22, 2022.

1          THE COURT:  I just have a question about the voices.

2          Officer, who is talking?  Who are the voices being

3     heard on this radio frequency?

4          THE WITNESS:  In that particular instance, it was

5     myself, I believe Deputy Tomaszewski, and possibly Detective

6     Osteen.

7          THE COURT:  All right; please continue.

8     BY MS. BERTI:

9     Q    Let me ask you another question.  How many deputies

10    approximately were involved in the surveillance?

11    A    Approximately five.

12    Q    Okay.  We hear someone on that radio say that it looks like

13    Mr. Kane is headed towards the courthouse and then parking.

14    Where ultimately did the vehicle stop -- did Mr. Kane's vehicle

15    stop?

16    A    It parked in -- there is back a alley parking.  I believe

17    the cross section is Atlantic Avenue and Depot Drive, and there

18    is some law office parking back there as well as some other

19    business parking.

20    Q    And I just referred to the courthouse, but what courthouse

21    are we talking about?

22    A    Fort Pierce downtown and on Second Street.

23    Q    So the state courthouse?

24    A    Yes, ma'am.

25    Q    Okay.

```
 1        (Audio recording played in open court.)
 2    BY MS. BERTI:
 3    Q   At some point, the deputies see Mr. Kane exit the vehicle;
 4    is that correct?
 5    A   Correct.
 6    Q   And do you remember where you were positioned at that time?
 7    A   I believe I was positioned on top of the parking garage
 8    that is directly east of that location -- I'm sorry, south.
 9    Q   Okay.
10        (Audio recording played in open court.)
11    BY MS. BERTI:
12    Q   Okay.  We hear -- is that you right there?
13    A   Yes, ma'am.
14    Q   We hear you saying that you are on top of the parking
15    garage and you will be able to tell when he comes out.  What
16    are you referring to?
17    A   When he exits the courthouse, the courthouse is where the
18    drug testing lab is located at.
19    Q   How did you know at that point or how did you become aware
20    that he was going to the courthouse to do drug testing?
21    A   I don't recall exactly, but I believe one of the other
22    deputies or detectives said he was walking into the courthouse;
23    and based on Deputy Tomaszewski speaking to Kristin Callahan,
24    she had told him that he had to report by the time the drug
25    testing lab closed that day or he was going to have his
```

```
 1   probation violated.

 2   Q   What time of day was it that you all were surveilling him

 3   and observing him go into the courthouse?

 4   A   I believe it was approximately 4:30 P.M.

 5   Q   Do you know whether that was consistent with sort of the

 6   end of the day when the drug testing facility or place that

 7   they had inside the courthouse would have have been getting

 8   ready to close?

 9   A   It was.

10   Q   Do you know whether or not Deputy Tomaszewski actually

11   spoke with Mr. Kane's probation officer on that date and around

12   that exact time that he was going into the courthouse?

13   A   Yes.

14   Q   Okay.

15       (Audio recording played in open court.)

16   BY MS. BERTI:

17   Q   At some point, did the deputy see him actually exit the

18   courthouse and then walk back to his vehicle?

19   A   I saw him exit the courthouse, and Deputy Lopez observed

20   him entering his vehicle.

21   Q   Okay.

22       (Audio recording played in open court.)

23   BY MS. BERTI:

24   Q   What happened just there, what was going on?

25   A   Mr. Kane was observed getting into his vehicle, backing
```

```
 1   out, and then just moving one parking space over.
 2   Q   Okay.  Approximately how long after -- how long did he stay
 3   in his vehicle after he re-entered it when he left the
 4   courthouse?
 5   A   Approximately five to ten minutes.
 6   Q   Okay.  And then he just sort of moves the vehicle to a
 7   different parking spot in that parking lot?
 8   A   Correct.
 9       (Audio recording played in open court.)
10   BY MS. BERTI:
11   Q   Who is that we hear speaking on the radio?
12   A   Deputy Tomaszewski.
13   Q   What is he describing that he is observing?
14   A   Jordan Kane vomiting out the side of his vehicle.
15   Q   So Jordan Kane, we hear on the radio and you testified to,
16   he moves the vehicle to a secondary parking spot.  Do you know
17   approximately how long he was in that secondary parking spot in
18   the parking lot?
19   A   I believe when he changed parking spots, it was only for
20   about five minutes.
21   Q   And we hear Deputy Tomaszewski initially say that he thinks
22   that the -- that Mr. Kane is leaning out the window or spitting
23   something out the window.  But ultimately, does Deputy
24   Tomaszewski confirm that he sees Mr. Kane actually vomiting out
25   of the side of that vehicle?
```

```
 1   A    He does.
 2   Q    Can you sort of explain what it was that Mr. Kane was
 3   doing, when that car door was opened?
 4   A    Based on Deputy Tomaszewski's statements, he observed the
 5   door come open, Jordan Kane's head lean out the side of the
 6   vehicle, and you could not see his face at that time, but you
 7   could see the vomit coming down and splattering on the asphalt
 8   there.
 9            THE COURT:  Is this while Mr. Kane is driving the
10   car?
11            THE WITNESS:  He was parked at that time, but he was
12   operating the vehicle.
13            THE COURT:  Okay, parked.  Okay -- parked in the
14   parking lot?
15            THE WITNESS:  Yes, ma'am.
16      (Audio recording played in open court.)
17            THE COURT:  Can you stop?
18            So who are the voices -- law enforcement voices that
19   I'm hearing now?
20            THE WITNESS:  Detective Mondragon, myself, Detective
21   Tomaszewski and Detective Osteen.
22            THE COURT:  How do you spell Mr. Mondragon's name?
23            THE WITNESS:  M-O-N-D-R-A-G-O-N.
24            THE COURT:  All right, please continue.
25      (Audio recording played in open court.)
```

```
 1   BY MS. BERTI:

 2   Q    Okay.  After Mr. Kane leaves the parking lot near the

 3   courthouse, where does he travel?

 4   A    He travels westbound on Orange Avenue and then north on

 5   29th Street into the north end of Fort Pierce.

 6   Q    And can you explain -- did he stop anywhere, or does he go

 7   directly there?

 8   A    At that point, he went directly there.

 9   Q    Does he live in that area?

10   A    He does not.

11   Q    Do you know where he lives?

12   A    Yes.  He lives on River Place, down in White City; 4900

13   River Place, in White City, off Midway Road.

14   Q    The area that he traveled to that he ultimately ends up in,

15   what is it that you -- do you know anything about that area?

16   A    That area is known for gun violence, drug sales,

17   prostitution, and gang members.

18   Q    Where ultimately does -- where were you during that time?

19   A    I was behind Mr. Kane, but I was a little ways back.

20   Q    Okay.

21              THE COURT:  And the area that you were just

22   describing, what area is that?

23              THE WITNESS:  North 29th Street and Avenue D would be

24   the closest cross street.

25              THE COURT:  And how do you know -- how have you come
```

```
 1    to describe the area, as you just did?
 2            THE WITNESS:  Based on crime rates, based on our
 3    investigations that take place there, most of our major crime
 4    are gang members.  29th Street actually have their own gang.
 5    There is the 29th Street Gang and just various calls for
 6    service, and things like that.
 7            THE COURT:  How long have you been with this
 8    division?
 9            THE WITNESS:  A year-and-a-half.
10            THE COURT:  That's the Special Investigative
11    Division?
12            THE WITNESS:  Yes, ma'am.
13            THE COURT:  And what did you do beforehand?
14            THE WITNESS:  I worked patrol as well as school
15    resource.
16            THE COURT:  So how many total years in law
17    enforcement did you have as of April 2021?
18            THE WITNESS:  Approximately four years, maybe just
19    under.
20            THE COURT:  Okay, thank you.
21            Please continue.
22    BY MS. BERTI:
23    Q   Does Mr. Kane's vehicle ultimately stop in this area?
24    A   It does.
25    Q   Okay.  I'll continue to play this.
```

1        (Audio recording played in open court.)

2    BY MS. BERTI:

3    Q   We hear, I think it is Deputy Tomaszewski say that he is

4    backed into a driveway and then ultimately that he is pulling

5    out.  Approximately, how long was he backed into a driveway on

6    Avenue E?

7    A   Approximately five minutes or less.

8    Q   Okay.

9        (Audio recording played in open court.)

10           MS. BERTI:  I'm going to pause this again.

11   BY MS. BERTI:

12   Q   Where does Mr. Kane go as soon as he leaves that location

13   on Avenue E?

14   A   He heads out towards 25th Street.

15   Q   What direction does he travel in once he gets to 25th

16   Street?

17   A   Southbound on 25th Street.

18   Q   Approximately how long after he is driving on 25th Street

19   is the traffic stop initiated?

20   A   Approximately a mile-and-a-half to two miles.

21   Q   Okay.

22       (Audio recording played in open court.)

23   BY MS. BERTI:

24   Q   I know it's a little hard to hear.  What is Deputy

25   Tomaszewski talking about right there?

```
 1   A    So Detective Osteen asked Deputy Tomaszewski if he had met
 2   with anybody and --
 3   Q    "He" being Jordan Kane?
 4   A    Yes.
 5   Q    Go ahead.
 6   A    And Deputy Tomaszewski advised Detective Osteen that he
 7   could not tell, he could only see the driver's side; so if he
 8   did, it would have been somebody from the passenger side.
 9   Q    Okay.
10        (Audio recording played in open court.)
11   BY MS. BERTI:
12   Q    At that point, I hear you on the radio.  What are you
13   saying?  Where were you located?
14   A    My vehicle was in front of Mr. Kane's vehicle.
15   Q    Okay.  Explain for the Court sort of what the positioning
16   of the police vehicles were at that point?
17   A    At that point, 25th Street is a two-lane road that heads
18   southbound, so Jordan Kane's vehicle is here on the left lane,
19   my vehicle was up here in the right lane, Detective Osteen's
20   vehicle was -- I believe there was a civilian car in between
21   and then Detective Osteen's vehicle up here, and Detective
22   Mondragon was directly behind Mr. Kane.
23   Q    How about Deputy Tomaszewski?
24   A    I know he was behind Detective Mondragon.
25   Q    And you mentioned that there is possibly a civilian vehicle
```

```
 1  sort of directly in front of Mr. Kane.  Was Mr. Kane sort of --
 2  I'll let you characterize this, but were the vehicles around
 3  Mr. Kane's vehicle police vehicles?
 4  A   They were.
 5  Q   And they were unmarked police vehicles?
 6  A   They were.
 7  Q   Okay.
 8      (Audio recording played in open court.)
 9  BY MS. BERTI:
10  Q   Okay, I am going to pause it for a second there.
11          We hear, I think that's Deputy Osteen saying,
12  "Whenever we have PC, we can stop him," correct?
13  A   Yes.
14  Q   Prior to Mr. Kane going to that house on Avenue E, where
15  did you believe that -- well, let me ask you this:  Were you
16  looking for reasons to stop him prior to him going to the house
17  on Avenue E?
18  A   We were not.
19  Q   Were you looking for probable cause to stop him prior to
20  going to that house on Avenue E?
21  A   We were not.
22          THE COURT:  Are you saying Avenue E?
23          MS. BERTI:  "E," yes.  "E" as in echo.
24      (Audio recording played in open court.)
25
```

Friday, May 22, 2022.

```
 1   BY MS. BERTI:
 2   Q    Who is speaking right there?
 3   A    That would be me.
 4   Q    What did you say?
 5   A    That he was failing to maintain his lane and going towards
 6   the center line and crossing over it.
 7   Q    And you were observing that in realtime?
 8   A    Yes.
 9        (Audio recording played in open court.)
10   BY MS. BERTI:
11   Q    All right.  I believe that's Deputy Tomaszewski.  What is
12   he remarking about the vehicle?
13   A    That the tint on the vehicle is too dark to see inside.
14   Q    I know that's Deputy Tomaszewski talking, but what did you
15   also observe about the tint?
16   A    I observed the tint was dark.  Actually, at that point, it
17   was so dark that I could not see that Mr. Baker was even inside
18   the vehicle.
19   Q    When did law enforcement become aware that Mr. Baker was in
20   the vehicle?
21   A    When the traffic stop was conducted.
22   Q    Okay.  And describe -- you said that the vehicle that
23   Mr. Kane is traveling in is, I think you said, a Chevy
24   Silverado.  What kind of vehicle is that?
25   A    It's a pickup truck.
```

1   Q   Okay.  And describe for the Court what the tint looked like

2   on, I guess, all of the windows of the pickup truck.

3   A   It was too dark to see in, so we wouldn't have been able to

4   see the occupants, just from the outside of the vehicle.

5   Q   And so you're traveling, you said, in front of Mr. Kane's

6   vehicle?

7   A   Yes.

8   Q   What did you observe about the tint on the windshield of

9   the vehicle?

10  A   I don't recall the tint on the windshield of the vehicle.

11  Q   Okay.  Were you able to see -- I guess you sort of answered

12  this, but were you able to see who was in the passenger seat

13  from the front view looking back?

14  A   I might have been able to; however, my attention was

15  focused on Jordan Kane.

16  Q   Okay.

17          THE COURT:  You said earlier that you saw the Chevy

18  Silverado swerving.  Can you describe what you saw?

19          THE WITNESS:  So at multiple times throughout this,

20  between I would say Okeechobee Road and Rhode Island, the

21  Silverado was leaving its lane of travel and going over into

22  the right lane by approximately one to two feet before

23  correcting and coming back into its lane.

24          THE COURT:  Okay, please continue.

25      (Audio recording played in open court.)

```
 1  BY MS. BERTI:

 2  Q   I'm going to pause it there.  We hear one of the deputies

 3  say, "I'm going to light him up," meaning he is going to now

 4  traffic stop the vehicle, correct?

 5  A   Correct.

 6  Q   What else, if anything, did you observe --

 7          MS. BERTI:  Judge, would it be okay if I sat?

 8          THE COURT:  Yes, that's fine.

 9  BY MS. BERTI:

10  Q   What else, if anything, did you observe when you were

11  watching Mr. Kane, when you were driving in front of the

12  vehicle?

13  A   I could also see that he was on a cellphone.

14  Q   What do you mean "on a cellphone"?

15  A   He had his phone in his right hand up by the steering

16  column.

17  Q   Okay.  And what did you believe that he was doing with the

18  cellphone?

19  A   Texting.

20  Q   Why texting versus, you know, just holding the phone?

21  A   Just based on the way his thumb was moving, you could

22  vaguely seeing his finger moving with the phone up in the air.

23          THE COURT:  And you are driving in front of the

24  vehicle?

25          THE WITNESS:  Front and then to the right, so at this
```

1    point, the civilian vehicle that I believe was in front of him

2    was no longer there, it was just Detective Osteen's vehicle in

3    the front, and I was up and to the right of the vehicle.

4    BY MS. BERTI:

5    Q    Just with regard to the tint that you mentioned and we hear

6    Deputy Tomaszewski talk about, have you ever pulled people over

7    for tint violations?

8    A    I have.

9    Q    Approximately how many times have you done that?

10   A    Approximately 10 to 15 times.

11   Q    And at the time that you all observed Mr. Kane driving in

12   the vehicle, did you or any of the other deputies believe that

13   the tint was actually illegal?

14   A    Yes.

15   Q    Do you know, based on Florida statutes, what percentage of

16   tint -- how the -- what makes tint illegal, what percentage?

17   A    I believe it is 26 to 28 percent.

18   Q    And what does that mean, when we are talking about the

19   percentage?

20   A    How much light it allows to come through the window.

21   Q    Okay.  Okay.  So you also testified about and the Judge

22   just asked you about the driving pattern that you observed.

23   Were the police vehicles that were around Mr. Kane following

24   him very closely?  Were they in very tight to him, or what was

25   their positioning?

```
 1  A   We were fairly close, there was two of us in the back, two

 2  of us in the front, which would have blocked any other vehicles

 3  from getting directly to the right of Mr. Kane.

 4  Q   Okay.  So after observing Mr. Kane -- let me ask you a

 5  couple more questions.  What time of day was this again, like

 6  at this point of the traffic surveillance?

 7  A   4:45, 5:00 o'clock.

 8  Q   And how would you describe the intersection that Mr. Kane

 9  was driving in at that point?

10  A   It is a very busy road, especially at that time of day.

11  Q   How many lanes is it actually on 25th Street?

12  A   It is four lanes with a middle turning lane.

13  Q   Okay.  And when you say it's busy, I mean, what are we

14  talking about?  Describe some of the traffic patterns that you

15  are familiar with from that area?

16  A   At that area at that time of day, it would be comparable to

17  rush hour traffic on US1.

18  Q   Okay.  Based on the totality of the circumstances and

19  everything you had observed over the course of that

20  surveillance in addition to everything that you knew previously

21  about Mr. Kane, did you have any reason to believe that he was

22  potentially under the influence of something when you saw him

23  driving?

24  A   Absolutely.

25  Q   Why is that?
```

```
 1  A    So based on all of my previous interactions with Mr. Kane,

 2  he has been intoxicated while he has been behind the wheel, he

 3  has been nodding off and things like that.  We watched him

 4  throw up while he was in the parking lot next to the

 5  courthouse, and it is common when people use opioids -- I know

 6  this based on my training experience -- that it has a delayed

 7  effect.  So it might not initially hit you, but as time goes

 8  on, then you start to really feel the effects of the narcotic.

 9  Q    Why is that relevant for the purposes of what you were

10  observing on that day?  You said that there is potentially a

11  delay.  I mean, what do you think could have occurred?

12        Well, I don't want you to speculate, but what were

13  you thinking could have occurred, essentially, and why, when

14  you are talking about that delay?

15  A    I believe that he had used narcotics and that the narcotics

16  were taking effect and that is why he was failing to maintain

17  his single lane.

18        THE COURT:  Can you get back to the single lane

19  issue?  So just visually, when did you see him swerving, as you

20  testified, and was that when you were positioned in front of

21  him to the right when those other law enforcement unmarked cars

22  were also on 25th Street?

23        THE WITNESS:  Yes, ma'am.

24        THE COURT:  I'm trying to understand visually what

25  happened because there has been a lot of movement in the
```

1   narrative, as far as where Mr. Kane was at various points.  So

2   talk to me specifically about the observations of the driving

3   patterns.

4           THE WITNESS:  So this would have taken place in

5   between -- on southbound 25th Street in between Okeechobee Road

6   and approximately Rhode Island.  So I would say that is

7   approximately a half-mile stretch.

8           THE COURT:  And this would have happened -- what do

9   you mean, what happened?

10          THE WITNESS:  Where he was failing to maintain a

11  single lane, where Mr. Kane was failing to maintain his lane.

12          THE COURT:  And in those moments when he was failing

13  to maintain his single lane, were there any other vehicles in

14  the area, anything else going on at that time?

15          THE WITNESS:  There was other traffic in the area,

16  however, we had his vehicle surrounded so no civilian vehicles

17  were next to him, in front, or behind.

18          THE COURT:  So at any point, did you perceive there

19  to be a danger or a security risk in that shifting of lanes as

20  you have described it?

21          THE WITNESS:  If our vehicles were not there to stop

22  a civilian vehicle from being there, then yes.

23          THE COURT:  All right, you may continue.

24  BY MS. BERTI:

25  Q   I know we talked about the tint, I just want to also --

Friday, May 22, 2022.

```
 1              MS. BERTI:  If I could approach the witness, Judge?

 2              THE COURT:  You may.

 3    BY MS. BERTI:

 4    Q   I want to show the witness a copy of what's been marked as

 5    Government's Exhibit Number 2, just ask you to take a look at

 6    this and tell me if you recognize it.

 7    A   I do.

 8    Q   Okay.  And what is contained on here that you recognize, or

 9    what is it you observed on this?

10    A   A video that was recorded from Mr. Baker's phone of the

11    traffic stop.

12       (Evidence identified as Government Exhibit No. 2)

13    BY MS. BERTI:

14    Q   Okay.  And is this a fair and accurate depiction of

15    essentially what happened in the moments right after

16    Mr. Baker -- or Mr. Kane and I guess also Mr. Baker were

17    stopped?

18    A   It is.

19              MS. BERTI:  At this time, Judge, the Government would

20    move into evidence what has been marked for identification as

21    Government's Exhibit 2.

22              THE COURT:  Any objection?

23              MS. AUGUSTIN-BIRCH:  No, Your Honor.

24              THE COURT:  Government's 2 is admitted without

25    objection.
```

1          (Evidence admitted as Plaintiff Exhibit No. 2)

2              MS. BERTI:  And I would ask the Court for permission

3      to publish this.  It is only a few seconds, Judge.

4              THE COURT:  Permission granted.

5          (Video recording played in open court.)

6      BY MS. BERTI:

7      Q    I have this muted for right now, but can you just briefly

8      explain to the Court what it is that we are observing in this

9      video?

10     A    So we have conducted the traffic stop, and now Detective

11     Osteen is at the passenger window speaking to Mr. Baker.

12         (Video recording played in open court.)

13     BY MS. BERTI:

14     Q    And I'm pausing the video at this point in the video.  What

15     is it that you observe at this point of the video that you can

16     explain to the Court?

17     A    You can observe how dark the window tint is on that back

18     window that is partially rolled up.  While you are able to

19     slightly see out of it, it makes it extremely difficult to see

20     in the vehicle indicating that the tint would be illegal.

21     Q    Okay.  Mr. Baker was not issued a citation for illegal

22     window tint, correct?

23     A    Correct.

24     Q    And you -- ultimately, you or I guess maybe the arresting

25     deputy ultimately didn't do a DUI investigation, correct?

1    A    Correct.

2    Q    Why not?

3    A    Based on the totality of the circumstances and the

4    significant felony charges that we had at the time, a simple

5    DUI is a misdemeanor so we went with the felony charges that we

6    had already acquired.

7    Q    You said there was significant felony charges.  After

8    Mr. Kane was pulled over, was he also -- I mean, we know

9    Mr. Baker was arrested, but was Mr. Kane also arrested?

10   A    He was.

11   Q    For what?

12   A    Drug possession and drug paraphernalia, to my recollection.

13   Q    So he also was in possession of narcotics when he was

14   pulled over on April 6, 2021?

15   A    He was.

16        MS. BERTI:  Okay.  May I have one moment, Judge.

17        THE COURT:  You may.

18   BY MS. BERTI:

19   Q    If you know, when that vehicle -- when Mr. Kane's vehicle

20   was stopped in the parking lot near the courthouse, that period

21   of time that we were discussing where the vomiting was going

22   on, do you know whether Mr. Kane's vehicle was actually

23   running?  Do you know whether it was idling or whether it was

24   parked with the ignition off?

25   A    I don't know for certain.

1          MS. BERTI:  Okay.  I don't think I have anything

2     further, Judge, I would tender the witness for

3     cross-examination.

4          THE COURT:  Who actually conducted the stop?

5          THE WITNESS:  Detective Mondragon was the one who

6     initiated his emergency lights; however, based on Jordan Kane

7     had a history of attempting to flee from us, we all would have

8     initiated our lights as we boxed in his vehicle, as he did try

9     to flee on that day.

10         THE COURT:  So you initiated your lights?

11         THE WITNESS:  Yes.

12         THE COURT:  Who actually wrote the ticket for the

13    swerving, if there was a ticket issued.

14         THE WITNESS:  I'm unsure if a citation or warning was

15    issued.

16         THE COURT:  So there would have been four police

17    vehicles at the time the lights were activated.

18         THE WITNESS:  Four to five, yes, ma'am.

19         THE COURT:  All unmarked cars basically encircling

20    Mr. Kane's car?

21         THE WITNESS:  Yes, Your Honor.

22         THE COURT:  And then when did you discover there was

23    an occupant in the car besides Mr. Kane?

24         THE WITNESS:  Once we approached the vehicle.

25         THE COURT:  And by "approach," you mean driving close

```
 1   to it or how?
 2           THE WITNESS:  No, once the vehicle was stopped.  So
 3   we attempted to do the stop, Mr. Kane attempted to flee; one of
 4   our other units was able to box him in.  At that point, his
 5   vehicle came to a stop.  This was maybe a section of road
 6   ten feet before we were able to get it to stop.  We exited our
 7   vehicles, when we approached the vehicle and the passenger
 8   window rolled down, that's when I saw Mr. Baker in the vehicle.
 9           THE COURT:  Okay, thank you.
10           Cross-examination?
11           MS. AUGUSTIN-BIRCH:  Your Honor, may I have a moment
12   before I begin?
13           THE COURT:  Yes.
14           MS. AUGUSTIN-BIRCH:  Thank you.
15      (Break in the proceedings)
16           MS. AUGUSTIN-BIRCH:  May I proceed, Your Honor.
17           THE COURT:  Yes.
18                        CROSS-EXAMINATION
19   BY MS. AUGUSTIN-BIRCH:
20   Q   Good morning, Detective Ridle.
21   A   Good morning.
22   Q   And it's detective, right?
23   A   Deputy.
24   Q   Deputy, I'm sorry.  Good morning, Deputy Ridle.
25   A   Good morning.
```

```
 1   Q    Now, earlier during direct examination, you referred to

 2   several different dates where law enforcement had contact with

 3   Mr. Kane, correct?

 4   A    Correct.

 5   Q    The first one being January 20th of 2021?

 6   A    Correct.

 7   Q    The second one, January 22nd of 2021?

 8   A    Correct.

 9   Q    Third one, February 2nd of 2021?

10   A    Correct.

11   Q    And then the date in question today is February -- I'm

12   sorry, April 6th of 2021.

13   A    Correct.

14   Q    Now, you also testified that Mr. Ridle [sic] had a history

15   of fleeing from law enforcement.

16            THE COURT:  I think you just said Mr. Ridle had --

17            MS. AUGUSTIN-BIRCH:  I'm sorry.  I'm sorry.

18   BY MS. AUGUSTIN-BIRCH:

19   Q    I'm looking at your name.

20   A    No problem.

21   Q    Deputy Ridle, you also testified that Mr. Kane had a

22   history of fleeing from law enforcement officers?

23   A    Attempting to flee.

24   Q    Attempting to flee from law enforcement officers?

25   A    Correct.
```

```
 1   Q   And there is a Florida statute that contains attempt to
 2   flee from law enforcement, correct?
 3   A   I believe so.
 4   Q   Now, on January 20th of 2021, Mr. Kane was arrested for
 5   drug possession, correct?
 6   A   Correct.
 7   Q   And drug paraphernalia, correct?
 8   A   Correct.
 9   Q   He was not arrested for attempting to flee, correct?
10   A   Correct.
11   Q   Then on January 22nd of 2021, he was arrested for tampering
12   with evidence, correct?
13   A   Correct.
14   Q   Drug possession, correct?
15   A   Correct.
16   Q   Drug paraphernalia possession, correct?
17   A   Correct.
18   Q   And then resisting officer without violence, correct?
19   A   Correct.
20   Q   There were no charges for attempting to flee an officer,
21   correct?
22   A   That would be the resisting without violence.
23   Q   And you would agree with me that there is a statute for
24   resisting an officer without violence, correct?
25   A   Correct.
```

```
1   Q   There is also resisting arrest with violence, correct?

2   A   Correct.

3   Q   And there is also a separate statute for fleeing and

4   eluding, correct?

5   A   Correct.

6   Q   Next on February 2nd of 2021, Mr. Kane was arrested for two

7   counts of drug possession, correct?

8   A   Correct.

9   Q   And he was also arrested for drug paraphernalia, correct?

10  A   Correct.

11  Q   He was not arrested for attempting to flee a law

12  enforcement officer?

13  A   Correct.

14  Q   And then on April 6th of 2021, Mr. Kane was arrested for a

15  drug possession, correct?

16  A   I don't have that report in front of me.

17  Q   And he was also arrested for paraphernalia, correct?

18  A   To my recollection, yes.

19  Q   He was not arrested for attempting to flee an officer,

20  correct?

21  A   It was my understanding that he was charged with resisting

22  arrest, but I could be wrong, I'm not looking at the affidavit

23  in front of me.

24  Q   Well, do you have a report, Deputy Ridle?

25  A   I do not have that one in particular, but I have all of the
```

```
 1   other ones.
 2   Q   Now earlier, during direct examination, you referenced two
 3   charges that you believe Mr. Kane was arrested for; do you
 4   remember that?
 5   A   The possession of a controlled substance and possession of
 6   drug paraphernalia.
 7   Q   And he was not arrested for attempting to flee an officer,
 8   correct?
 9   A   I don't have the report in front of me.  Those were the two
10   that I knew off the top of my head.
11   Q   Would anything refresh your memory?
12   A   Yes, if I could take a look at the affidavit.
13   Q   Are you referring to the arrest affidavit?
14   A   Yes, ma'am, for January -- I'm sorry, April 6th.
15           MS. AUGUSTIN-BIRCH:  Your Honor, may I approach the
16   witness?
17           THE COURT:  Yes.
18           THE WITNESS:  Thank you, ma'am.
19           MS. AUGUSTIN-BIRCH:  You are welcome.
20           For the record, Your Honor, I have handed Deputy
21   Ridle a copy of the arrest affidavit for Mr. Kane.
22           THE COURT:  That's for the April 6th?
23           MS. AUGUSTIN-BIRCH:  For the April 6th arrest, yes,
24   Your Honor.
25           THE COURT:  Okay.
```

1              THE WITNESS:  So that would be the charge of the

2    resisting without violence.

3    BY MS. AUGUSTIN-BIRCH:

4    Q   Okay.

5              MS. AUGUSTIN-BIRCH:  May I approach again, Your

6    Honor?

7              THE COURT:  Yes, you don't have to ask again.

8              MS. AUGUSTIN-BIRCH:  Thank you.

9              THE WITNESS:  Thank you, ma'am.

10   BY MS. AUGUSTIN-BIRCH:

11   Q   Has your memory been refreshed?

12   A   It has.

13   Q   Was Mr. Kane arrested for attempting to flee an officer?

14   A   No, he was charged with resisting without.

15   Q   And resisting without violence is a misdemeanor, correct?

16   A   Correct.

17   Q   And the possession of paraphernalia is also a misdemeanor?

18   A   Correct.

19   Q   And the possession of controlled substance is a felony?

20   A   Yes, ma'am.

21   Q   And earlier, you testified that Mr. Kane was not

22   investigated for a DUI, correct?

23   A   Correct.

24   Q   And you also mentioned that a DUI is a misdemeanor,

25   correct?

```
 1    A    Correct.

 2    Q    However, Mr. Kane was arrested for two separate

 3    misdemeanors on April 6, 2021?

 4    A    Correct.

 5    Q    And law enforcement did not conduct any field sobriety

 6    tests on that day, correct?

 7    A    Correct.

 8    Q    No walk-and-turn test was done, correct?

 9    A    So based on the previous interactions that we have had with

10    Jordan Kane, he is very uncooperative with law enforcement.  He

11    won't speak to us, which is obviously his right, but he does

12    not assist us in any investigation that we are trying to take

13    part in, so it wouldn't have -- it would have been difficult to

14    have him do those exercises.

15    Q    So I'll ask my question again.  Did Mr. Kane do a walk-and-

16    turn test?

17    A    No.

18    Q    Did he do the one-leg stand test?

19    A    No.

20    Q    And did he do the horizontal gaze test?

21    A    No.

22    Q    And all the tests that I just mentioned are part of a

23    variety of tests that law enforcement officers will conduct

24    when someone is suspected to be driving under the influence; is

25    that correct?
```

1   A    They are exercises that can be used, yes.

2   Q    And actually, let's go back to prior to the traffic

3   violation.

4            THE COURT:  I just have a question.

5            The arrest for drug possession and drug

6   paraphernalia, can you describe what was actually found in the

7   vehicle on April 6th?

8            THE WITNESS:  May I refer back to the report one more

9   time?

10           THE COURT:  Yes.

11           THE WITNESS:  Thank you, ma'am.

12           So, Your Honor, it looks like inside of vehicle we

13   located a spoon with white residue, hypodermic needle,

14   prescription bottle of Prednisone under the name of Jordan

15   Kane, that bottle contained a plastic bag with a gel cap with

16   fentanyl, a bag with brown powder also fentanyl, and a bag with

17   white powder crystals, MDPV/Molly.  The total weight was less

18   than one gram.

19           THE COURT:  Okay, thank you.

20           And then, the misdemeanor, resisting without

21   violence, do you know what the basis of that was?

22           THE WITNESS:  That was Mr. Kane attempting to flee.

23           THE COURT:  And when you say "attempting to flee,"

24   what do you mean in reality; running on foot or what?

25           THE WITNESS:  No.  He attempted to run in his

1   vehicle.  He drove forward to try to turn to the left to go

2   around the stop unmarked patrol vehicle that was in front of

3   him; however, another unmarked patrol vehicle came from the

4   side and stopped his vehicle where he was unable to continue

5   without crashing into one of our vehicles.

6           THE COURT:  So in terms of the sequence, you are

7   saying the lights were activated, and then what happened?

8           THE WITNESS:  We activating our emergency lights,

9   there was three of us.  One of us in the front, one of us in

10  the back, one of us on the side.  The detective or deputy,

11  whoever was on the left side, was a little bit too far back

12  when the stop initiated, so Jordan Kane attempted to accelerate

13  his vehicle to go around the car in front of him.

14          So we are in the left-hand -- Jordan Kane's vehicle

15  is in the left-hand lane.  Right next to it, we have the

16  turning lane.  The unmarked patrol vehicle here had to speed up

17  to block Jordan Kane's vehicle from exiting through the gap

18  that was created when the stop happened.

19          THE COURT:  Okay, thank you.

20          THE WITNESS:  If I can draw it --

21          THE COURT:  It would have been helpful to have a

22  visual, I will say, because of the movements of the various

23  cars.  I'll leave it up to the Government whether they wish to

24  depict this any further.

25          Ms. Birch, you can continue your cross-examination.

```
 1              MS. AUGUSTIN-BIRCH:  Thank you, Your Honor.
 2    BY MS. AUGUSTIN-BIRCH:
 3    Q   Now, you testified during direct examination that Mr. Kane
 4    was under surveillance on April 6th of 2021, correct?
 5    A   Yes, ma'am.
 6    Q   And that was pursuant to a conversation that law
 7    enforcement had with Mr. Kane's probation officer?
 8    A   Correct.
 9    Q   And that conversation, just to summarize it, was that he
10    had tested positive for controlled substances?
11    A   Correct.
12    Q   And on April 6th of 2021, law enforcement saw Mr. Kane
13    traveling in his vehicle?
14    A   Correct.
15    Q   He was observed to go inside of a smoke shop, correct?
16    A   Correct.
17    Q   And a traffic stop was not conducted at the time?
18    A   Correct.
19    Q   Mr. Kane was observed driving towards the state courthouse
20    in Fort Pierce, correct?
21    A   Yes, ma'am.
22    Q   And a traffic stop was not conducted at that time, correct?
23    A   Correct.
24    Q   Mr. Kane was also observed throwing up, correct?
25    A   Correct.
```

```
1   Q    And during direct examination, you testified that Mr. Kane

2   was operating his vehicle at the time that he was parked in the

3   parking garage, correct?

4   A    Correct.

5   Q    And a traffic stop was not conducted at that time?

6   A    Correct.

7   Q    And then, Mr. Kane left the parking garage area, and a

8   traffic stop was not conducted at that time, correct?

9   A    Correct.

10  Q    And then he traveled west on Orange Avenue, then north on

11  25th Street, correct?

12  A    I believe it was north on 29th Street.

13  Q    Twenty-ninth Street, and you describe that area as the

14  north Fort Pierce area.

15  A    Yes, ma'am.  I believe the neighborhood is called Lincoln

16  Park.

17  Q    And a traffic stop was not conducted at that time.

18  A    Correct.

19  Q    And then you also testified that Mr. Kane went to a

20  residence, I believe.

21  A    Correct.

22  Q    And he was there for approximately five minutes, correct?

23  A    Correct.

24  Q    And a traffic stop was not conducted at that time, correct?

25  A    Correct.
```

```
 1   Q    Then he left the area and started traveling, at some point,

 2   south on 25th Street, correct?

 3   A    Correct.

 4   Q    And you testified that law enforcement observed the tint

 5   was very dark, correct?

 6   A    Correct.

 7   Q    And you also testified that you could not see inside of a

 8   vehicle, correct?

 9   A    Correct.

10   Q    And you also testified that you saw a phone.  Whose hand

11   did you see the phone in, Mr. Baker or Mr. Kane?

12   A    Mr. Kane.

13   Q    So you saw a phone in Mr. Kane's hand, while he was

14   traveling on 25th Street, correct?

15   A    Correct.

16   Q    And you also observed that he was able to -- he was

17   texting?

18   A    That was my assumption of what he was doing on his phone.

19   Q    And that was based on the way his fingers were moving, you

20   made the assumption that he may have been texting, is that

21   correct?

22   A    Correct.

23   Q    So you were able to see what Mr. Kane was doing inside of

24   the vehicle, correct?

25   A    Correct.
```

1    Q    Now, you described for Judge Cannon, when she asked about

2    where all of the law enforcement vehicles were located, while

3    you were on 25th street; do you remember that?

4    A    Yes.

5    Q    And am I correct in saying that Mr. Kane's vehicle did not

6    strike any other vehicle, correct?

7    A    Correct.

8    Q    Mr. Kane's vehicle also did not cause any other vehicles to

9    get out of the way, correct?

10   A    Correct.

11   Q    And you also testified that your vehicle and the other law

12   enforcement officers' vehicle were in close proximity to

13   Mr. Kane's vehicle, correct?

14   A    Correct.

15   Q    And at no point did any -- your vehicle or any other law

16   enforcement vehicle had to move out of the way because of

17   Mr. Kane's driving, correct?

18   A    Correct.

19   Q    Now, Ms. Berti played the radio traffic control and you

20   described for the Court, you know, the language that is used by

21   law enforcement and the conversation that you all had regarding

22   your surveillance of the vehicle, correct?

23   A    Yes, ma'am.

24   Q    And during that conversation, there is mention of PC,

25   correct?

```
 1   A    Correct.

 2   Q    And "PC" is probable cause, correct?

 3   A    Yes, ma'am.

 4   Q    And there is a discussion as to when, in your view or law

 5   enforcement view, is the proper time to stop the vehicle,

 6   correct?

 7   A    Correct.

 8   Q    And that is because probable cause is needed to stop the

 9   vehicle, correct?

10   A    Correct.

11   Q    And you also mentioned during your surveillance that when

12   Mr. Kane went to the courthouse, for example, law enforcement

13   was not looking for probable cause at that time, correct?

14   A    Correct.

15   Q    And when Mr. Kane went to the smoke shop, law enforcement

16   was not looking for probable cause at that time, correct?

17   A    Correct.

18   Q    And then when he traveled, you know, throughout Fort Pierce

19   to go to the residence in north Fort Pierce, law enforcement

20   was not looking for probable cause at that time, correct?

21   A    Correct.

22   Q    And the time that -- in your view, that there was probable

23   cause is when Mr. Kane allegedly fails to maintain a single

24   lane, correct?

25   A    As well as the other things, but yes.
```

```
1   Q   The other things that happened earlier in the day, is that

2   what you mean, when you say "other things"?

3   A   No, the being on the phone and the dark window tint.

4   Q   But you were able to see Mr. Kane's phone in his hand

5   possibly texting, while you were on 25th Street, correct?

6   A   Through his front windshield, yes.

7   Q   Now, when the vehicle, prior to the stop of the vehicle,

8   the vehicle had stopped at the light around 25th Street and

9   Virginia Avenue, correct?

10  A   Is this after he has left the residence?

11  Q   Correct.

12  A   We did not make it down to Virginia Avenue.

13  Q   Am I correct in saying that there were other cars that were

14  stopped in front of Mr. Kane at that 25th Street and Virginia

15  light?

16  A   We didn't make it down to the Virginia light.  The traffic

17  stop took place at 25th and Rhode Island which is north of the

18  Virginia intersection.

19  Q   And that's closer to Lawnwood Hospital, correct?

20  A   Correct.

21  Q   And there is a traffic light there, correct?

22  A   No.

23  Q   There is not a traffic light at 25th and where Lawnwood

24  Hospital is?

25  A   No, ma'am.
```

```
1    Q    And you testified that you activated your sirens?

2    A    I activated my emergency lights.

3    Q    Your emergency lights, I'm sorry, you activated them.

4    A    Yes, ma'am.

5    Q    And law enforcement officers exited the vehicle to approach

6    Mr. Kane's vehicle, correct?

7    A    Correct.

8    Q    And guns were drawn at that point?

9    A    When he attempted to flee, yes.

10   Q    And the four cars that you described for the Court, they

11   were still essentially in the same pattern that you described

12   earlier, correct?

13   A    Correct.

14   Q    I believe there was two in front of Mr. Kane's vehicle to

15   the right and left?

16   A    Correct.

17   Q    And then there are also two more vehicles behind Mr. Kane's

18   vehicle, correct?

19   A    Correct.

20        MS. AUGUSTIN-BIRCH:  Your Honor, may I just have a

21   moment to look at my notes?

22        THE COURT:  Sure.

23        MS. AUGUSTIN-BIRCH:  Thank you.

24     (Break in the proceedings.)

25
```

Friday, May 22, 2022.

```
 1   BY MS. AUGUSTIN-BIRCH:

 2   Q    Now, you prepared a supplemental report in this case,

 3   correct?

 4   A    Correct.

 5   Q    And the other officer, and I'm probably going to

 6   mispronounce his name, but Deputy Tomaszewski?

 7   A    Tomaszewski.

 8   Q    Tomaszewski.?

 9            THE COURT:  How do you spell that name again, I'm

10   sorry?

11            THE WITNESS:  T-O-M-A-S-Z-E-W-S-K-I.

12            THE COURT:  Thank you.

13   BY MS. AUGUSTIN-BIRCH:

14   Q    And he also prepared a report in this case, correct?

15   A    Yes, ma'am.

16   Q    And you had an opportunity to review those reports in

17   preparation for the hearing today?

18   A    Yes, ma'am.

19   Q    And you told us that you are a trained law enforcement

20   officer, correct?

21   A    Yes, ma'am.

22   Q    And when you were hired by the Sheriff's Office department,

23   you had to go through training, correct?

24   A    Yes, ma'am.

25   Q    And part of that training included writing reports,
```

```
 1   correct?

 2   A    Yes, ma'am.

 3   Q    And you were taught in your training about the importance

 4   of including important facts in relation to a case, correct?

 5   A    Correct.

 6   Q    And those important facts do not necessarily mean every

 7   single fact but at least important facts, correct?

 8   A    Correct.

 9   Q    And in your report, you -- that you reviewed, there was a

10   mention of the failure to maintain a single lane, correct?

11   A    Correct.

12   Q    And am I correct in saying that there was no mention of the

13   dark tint, correct?

14   A    Correct.

15           MS. AUGUSTIN-BIRCH:  May I have a moment again, Your

16   Honor?

17           THE COURT:  We are going to take a ten-minute

18   restroom break.

19           MS. AUGUSTIN-BIRCH:  Thank you.

20           THE COURT:  Please do not discuss the substance of

21   your testimony.

22           THE WITNESS:  Yes, Your Honor.

23      (Recess was had at 11:34 A.M.; and the proceedings

24      Resumed at 11:43 A.M.)

25           THE COURT:  You may be seated.
```

```
 1              MS. AUGUSTIN-BIRCH:  Your Honor, I have no further
 2   questions.
 3              THE COURT:  Okay, thank you.
 4              Any redirect?
 5              MS. BERTI:  Yes, Judge.
 6                     REDIRECT EXAMINATION
 7   BY MS. BERTI:
 8   Q   Okay, Detective Ridle, I know you were asked on
 9   cross-examination about there being this history of fleeing, as
10   you characterized it; and you were asked specifically about
11   some dates.  I want to ask you about the January 22nd date that
12   Mr. Kane was stopped.
13              Do you have a copy of that report up there in front
14   of you?
15   A   Yes, ma'am, I do.
16   Q   Okay.  So you acknowledged, when you were under
17   cross-examination, that there was a violation of the law
18   written there for resisting an officer without violence?
19   A   Yes.
20   Q   Okay.  And in that arrest affidavit, does it actually
21   mention the actions that Mr. Kane took on January 22nd, that
22   essentially make up the PC for the resisting without violence?
23   A   It does.
24   Q   What happened there and what is described in the report?
25   A   So Detective Martinez initiated his emergency lights to
```

```
 1   conduct a traffic stop for the above-referenced infractions,

 2   the driver identified as Jordan Kane, acknowledged that there

 3   were Sheriff's Office vehicles behind him and attempted to

 4   squeeze through traffic.

 5            At that time, unmarked units were next to his vehicle

 6   and Kane could be seen using a butane torch to smoke a blunt

 7   later field tested positive for MDMA/Molly.

 8   Q   Okay.  So on that particular traffic stop, is that sort of

 9   similar driving behavior to what you sort of described on

10   April 6th, like sort of trying to squeeze through the other

11   vehicles around him?

12   A   Yes.

13   Q   On April 6th of 2021, again, you had a chance to refresh

14   your recollection by looking at the report and determined that,

15   in fact, Deputy Tomaszewski wrote a -- or arrested Mr. Kane in

16   addition for the drug charges on the resisting an officer

17   without violence?

18   A   Correct.

19   Q   Okay.  And in this report, it references, Deputy

20   Tomaszewski references that Mr. Kane kept the vehicle in drive,

21   moved forward southbound on 25th Street attempting to flee from

22   the traffic stop until he realized there was another unmarked

23   patrol vehicle in front of him and he could not proceed

24   further.

25            THE COURT:  What date are you referencing there?
```

1       MS. BERTI:  April 6th of 2021, the date of the

2  traffic stop.

3  BY MS. BERTI:

4  Q   On that particular date, why was it that law enforcement

5  sort of had him boxed in like that?

6  A   Because of his history of attempting to flee, we didn't

7  want to give him the opportunity, especially at that time of

8  day where there is so much other traffic on the roadway.

9  Q   You mentioned some of the drug paraphernalia items, and it

10  sounds like some drugs were located in Mr. Kane's vehicle.

11  What else was located in Mr. Kane's vehicle?  I don't know if

12  you mentioned from the report, specifically with regard to

13  Mr. Kane, I guess I should say?

14  A   On the April 6th arrest?

15  Q   Correct.

16  A   May I refer back to that report?  I don't want to misquote.

17  Q   You don't have a copy of that, correct?

18  A   I do not.

19       MS. BERTI:  May I have permission to approach the

20  witness with a copy of that report.

21  BY MS. BERTI:

22  Q   I'm going to refer you to the second page of that report.

23  A   So a search of the vehicle was conducted and inside the

24  center console contained a container of high voltage Detrox,

25  D-E-T-R-O-X, it was D-E-T-R-O-X dash Double Flush was located.

1    The box contained the following items:  A spoon with white

2    residue, a hypodermic needle, a prescription bottle of

3    Prednisone under the name of Jordan Kane.  The bottle contained

4    a plastic bag with a gel cap with fentanyl, a bag with brown

5    powder also fentanyl, and a bag with white powder crystals

6    which tested positive for MDPV/Molly.

7         MS. BERTI:  May I have permission to re-approach the

8    witness?

9         THE COURT:  You do.

10   BY MS. BERTI:

11   Q   So that box you just referenced that had some of those

12   drugs or drug paraphernalia in it, what was that box?  What is

13   that stuff?

14   A   That is used to help pass a drug test to flush your system

15   out, so you don't fail a drug test.

16   Q   Like, what is it?  Is it a drink, is it a powder, is it

17   a --

18   A   To be honest, I don't know exactly what it is.  I believe

19   it is a combination.

20   Q   Okay.  When Mr. Kane was actually pulled over on April 6th

21   and ultimately then arrested, do you know whether or not he

22   was -- well, let me ask this way:  Did he appear to be under

23   the influence of drugs?

24   A   He did.

25   Q   What is that based on?  What is that assumption based on?

1   A   His slowed speech; he is nodding; you can see his eyes are

2   shutting like he is going to fall asleep.  They are all signs

3   that are indicative of opioid use.

4   Q   When you all were driving around Mr. Kane, why were you

5   following him at the distances and at the spacing that you were

6   following him at?

7   A   To not alert him of our presence.

8   Q   Okay.  So how would you -- how was it that you were going

9   about doing that?  I mean, how close, in actuality, are you to

10  Mr. Kane's vehicle?

11  A   Prior to establishing the probable cause or where we were

12  going to establish the probable cause for the traffic stop, we

13  would have been maybe six to eight car lengths away minimum,

14  depending on traffic patterns.  If traffic is heavy, obviously,

15  we can get a little bit closer.  For example, when he parked at

16  the courthouse -- I'm sorry, across the street from the

17  courthouse, we would have been a little bit further away so he

18  didn't observe our vehicles.

19  Q   Okay.  How about sort of after he is driving southbound on

20  25th Street and you guys have decided you were going to

21  actually attempt to traffic stop this vehicle, what types of

22  distances are we talking about at that point?

23  A   Close, within one to two car lengths with only our vehicles

24  surrounding him.

25  Q   Okay.  So you are referring to that as close, but you are

1  also describing that as one to two car lengths away.

2  A   A safe distance away for not -- not tailgating.

3       MS. BERTI:  All right.  And I'm going to show to

4  Defense what is marked as Government's Exhibit Number 3, for

5  identification.

6       May I have permission to approach?

7       THE COURT:  You do.

8  BY MS. BERTI:

9  Q   Detective Ridle, I'm going to show you Government's Exhibit

10 Number 3; if you can take a look at that and familiarize

11 yourself with that photograph and then tell me when you are

12 done.  Take a look at it.

13 A   I'm familiar.

14 Q   Okay.  Do you recognize --

15      THE COURT:  You need a mic.

16      THE WITNESS:  I'm sorry.

17      Yes, this is the intersection of Okeechobee Road and

18 South 25th street.

19   (Evidence identified as Plaintiff Exhibit No. 3)

20 BY MS. BERTI:

21 Q   Is that approximately the location where you begin to

22 attempt to develop the probable cause to initiate the traffic

23 stop on Jordan Kane?

24 A   Yes.

25      MS. BERTI:  At this time, Judge, the Government would

```
 1   move into evidence what has previously been marked for

 2   identification as Government's Exhibit 3.

 3             THE COURT:  Any objection?

 4             MS. AUGUSTIN-BIRCH:  No, Your Honor.

 5             THE COURT:  I haven't even seen it, I don't know.

 6             MS. BERTI:  Can you --

 7             Thank you.

 8   BY MS. BERTI:

 9   Q   Can you describe -- actually, if you wouldn't mind holding

10   that up for the Court, so we can all see.  Can you describe

11   which roads are which in that depiction?

12             THE COURT:  So just to be clear, Government's

13   Exhibit 3 has been admitted without objection; and what is the

14   description of this?

15             MS. BERTI:  That is a photograph of the intersection

16   of Okeechobee and 25th Street in Fort Pierce.

17        (Evidence admitted as Government's Exhibit No. 3.)

18             THE COURT:  Deputy, why don't you describe the

19   exhibit for us?

20             THE WITNESS:  So the road that you see on this side

21   of the picture, that is westbound Okeechobee Road.  This is

22   southbound 25th Street.  The cars that you see here in the

23   picture are traveling north on 25th Street, so these are the

24   southbound lanes that Jordan Kane was traveling in.  He would

25   have been in the left lane travel southbound through this
```

```
 1   intersection.

 2           THE COURT:  Okay, thank you.

 3   BY MS. BERTI:

 4   Q   Now, where was it that law enforcement actually ultimately

 5   conducted the traffic stop?

 6   A   Approximately 25th Street and Rhode Island.

 7   Q   So how are in feet or in distance down from that

 8   intersection is that?

 9   A   Maybe a half-mile.

10   Q   Okay.  And can you again show -- and I can give you an ink

11   pen to draw with, if that would work, but can you show the

12   Court where it was that the vehicles, the police vehicles and

13   Mr. Kane's vehicle were on that particular picture?

14           THE COURT:  Why don't we use the Elmo?  If you put

15   the photograph on the Elmo, then you can --

16           MS. BERTI:  Can I ask the witness to step down?

17           THE COURTROOM DEPUTY:  Can I help him?

18           THE COURT:  Yes.  You can draw from over here.

19           THE WITNESS:  So we will use yellow to demonstrate

20   Mr. Kane's vehicle.  So where we were at the time, we were a

21   little bit further south of this location, but I can still give

22   you, based on the road layout, where our vehicles would have

23   been positioned at the time of the stop.

24   BY MS. BERTI:

25   Q   Can you go ahead and do that, please.
```

Friday, May 22, 2022.

```
 1    A    Absolutely.  So Mr. Kane's vehicle would have been here, in

 2    the left lane; and then I will use blue to signify the law

 3    enforcement vehicles.

 4           We would have had one vehicle here, another vehicle

 5    behind him.  I was slightly ahead of him in the right lane, and

 6    there was another vehicle right here, directly in front of him.

 7    Q    So at the time that the vehicles, I guess, activated their

 8    emergency lights to attempt to conduct the traffic stop, which

 9    vehicle is it that you're -- that you said kind of moved to the

10    left of Mr. Kane's vehicle, which positioned vehicle?

11    A    Going off -- I'm sorry.

12           THE COURT:  I'm sorry, can you restate the question?

13    BY MS. BERTI:

14    Q    In looking at this depiction, which one of these circles

15    that represents a police vehicle would have moved forward to

16    try to box in Mr. Kane's vehicle?

17    A    Thinking back on it now, I believe there might have been a

18    fifth vehicle, as well, and that vehicle would have been over

19    here.  So the vehicle in the middle, this is Detective

20    Mondragon's vehicle right here.  This vehicle would have been

21    moved up here to the side as my vehicle came down here to this

22    side.  Detective Osteen's vehicle was directly in front.

23    Q    Detective Osteen, can you mark which one would have been

24    Detective Osteen's.

25    A    It doesn't really work that well when you draw circles.
```

```
 1   Q    So the vehicle sort of directly in front of Mr. Kane's

 2   vehicle would have been Detective Osteen's?

 3   A    Correct.

 4            MS. BERTI:  May I have one moment, Judge?

 5            THE COURT:  Sure.

 6   BY MS. BERTI:

 7   Q    Okay.  So Detective Osteen {sic}, is it your opinion or

 8   your belief that Mr. Kane was actually attempting or would have

 9   attempted to flee from law enforcement --

10            MS. AUGUSTIN-BIRCH:  Objection, Your Honor,

11   speculation.

12            THE COURT:  Sustained, you can rephrase the question.

13   BY MS. BERTI:

14   Q    When you activated your blue lights or your emergency

15   lights, what occurred?  What did Mr. Kane do?

16   A    Jordan Kane attempted to accelerate his vehicle to go

17   around Detective Osteen's vehicle in an attempt to flee.

18   Q    I know you were asked a lot on cross-examination, sort of

19   about the moments in time when law enforcement did not stop or

20   did not attempt to stop Mr. Kane's vehicle.  What did you think

21   had occurred when he was on Avenue E that led you to believe

22   that he was under the influence of drugs, as he was driving

23   down 25th Street?

24   A    Can you rephrase?

25   Q    Sure.  After Mr. Kane stopped off at that address on --
```

```
 1   excuse me, at that address on Avenue E, what did you think

 2   occurred there or what did you and the other deputies think

 3   occurred there that caused you to believe that Mr. Kane was

 4   under the influence?

 5           MS. AUGUSTIN-BIRCH:  Objection, Your Honor,

 6   speculation.

 7           THE COURT:  I'll sustain it because it was a bit

 8   confusing.  Can you rephrase the question in a clear way?

 9   BY MS. BERTI:

10   Q   You described the area on Avenue E where Mr. Kane stopped

11   his vehicle for a period of time, correct?

12   A   Correct.

13   Q   And what did you describe that area to be like?

14   A   High narcotics sales, high gang violence, high gun

15   violence.

16   Q   You were also aware at that time that Mr. Kane traveled

17   directly to Avenue E that he had just come from the courthouse

18   to do a drug test, correct?

19   A   Correct.

20   Q   Are you aware of, based on state court cases you have done,

21   if someone has to do a drug test, will they have to do one

22   again the next day?

23   A   It is my belief that there is typically a time period in

24   between after when they test and then when they have to retest.

25   Q   Okay.  Based on some of the cases that you have been
```

Friday, May 22, 2022.

```
 1    involved in, is that -- you said a time; but I mean, do you

 2    know of any defendants you have arrested or, I guess, targets

 3    you have investigated who have had to drug test immediately

 4    following, like, let's say the next day?

 5    A    No, I do not.

 6    Q    Did you believe, based on the fact that Mr. Kane had just

 7    given a drug test, that there would be a period of time after

 8    that drug test on April 6th where he would not have to test

 9    again for a period of time?

10    A    Yes.

11    Q    And again, you testified that directly after leaving the

12    courthouse, he traveled to the address on Avenue E.

13    A    Correct.

14    Q    Based on your training and experience as a law enforcement

15    officer and all of the totality of the circumstances that you

16    had been observing, both on that date and in your prior

17    interactions with Mr. Kane in 2021, what did you believe

18    occurred on Avenue E?

19              MS. AUGUSTIN-BIRCH:  Objection, Your Honor,

20    speculation.

21              THE COURT:  I'll overrule the objection, you can ask

22    the question -- I mean answer the question.

23              THE WITNESS:  I believed he was going there to buy

24    narcotics.

25
```

```
 1   BY MS. BERTI:

 2   Q   Okay.  And based on your interaction with Mr. Kane, did you

 3   know sort of what types of narcotics he had been using?

 4   A   Yes.

 5   Q   What types of narcotics were those?

 6   A   MDMA, Molly, MDPV; they are all basically street terms for

 7   the same thing or terms for that same drug, as well as

 8   fentanyl.

 9           THE COURT:  What made you think that he was buying

10   narcotics at that Avenue E address?

11           THE WITNESS:  Just because that general area is

12   common for drug sales as well as we know he lives down in White

13   City, he is coming from the courthouse, directly after taking a

14   drug test, so in his mind, he is going to be able to -- he is

15   not going to have to test for a few days, so he is going to be

16   able to use narcotics again, until his next test.  We know he

17   has failed a drug test in the past, so it is not uncommon for

18   him to continue to use.  So for him to go to that neighborhood

19   would not be uncommon of buying narcotics.

20           THE COURT:  But you don't have any particular

21   information about that Avenue E residence?

22           THE WITNESS:  No, not at that time.

23           THE COURT:  Okay.

24           You may continue.

25
```

Friday, May 22, 2022.

 1    BY MS. BERTI:

 2    Q   Based on your training and experience as a law enforcement

 3    officer, specifically in the Narcotics Division, what is your

 4    understanding about the use of these particular types of drugs

 5    that you are describing Mr. Kane to having -- to having

 6    previously used, what happens to someone when they ingest these

 7    types of drugs?

 8    A   So fentanyl is what we classify as a downer, and Molly is

 9    classified as what we say, an upper.  So people will typically

10    use fentanyl, they will get to that low where they are starting

11    to fall asleep, get drowsy, then they will use Molly to

12    counteract that and bring them up in sort of a middle level

13    between the high and low, while maintaining their high.

14    Q   Does that happen within seconds?  What is sort of the time

15    period we are talking about?

16    A   With Molly, if you are smoking it, which would be the

17    upper, that is a much faster high.  It is going to hit you a

18    lot quicker now as opposed to fentanyl.  Fentanyl has a delayed

19    reaction when it enters your system, so it is kind of like

20    drinking alcohol.  If you consume alcohol, there is going to be

21    a time period before that alcohol takes effect on your system

22    and on your brain.

23    Q   So when we are talking about somebody who is a fentanyl

24    user, is it possible that they can still be coherent for a

25    brief period of time after they have actually shot fentanyl or

```
 1    ingested fentanyl?

 2    A   Absolutely.

 3              MS. BERTI:  Okay, I don't have anything further.

 4              THE COURT:  I just have a question about the timing.

 5    How much total time would you say from when the surveillance of

 6    Mr. Kane's vehicle started until the traffic stop was

 7    effectuated?

 8              THE WITNESS:  My estimate of that would be 45 minutes

 9    to an hour.

10              THE COURT:  Okay, thank you.

11              MS. AUGUSTIN-BIRCH:  Your Honor, I have two more

12    questions to follow-up, may I?

13              THE COURT:  Sure, you may.

14                        RECROSS-EXAMINATION

15    BY MS. AUGUSTIN-BIRCH:

16    Q   Good morning, again --

17    A   Good morning.

18    Q   -- Deputy.

19              You never -- you or any other law enforcement officer

20    never observed Mr. Kane purchase any type of controlled

21    substance on April 6th of 2021, correct?

22    A   Correct.

23    Q   And you and any other law enforcement officer never

24    observed Mr. Kane ingest any type of narcotic, correct?

25    A   Correct.
```

```
 1                 MS. AUGUSTIN-BIRCH:  Thank you, Judge.

 2                 THE COURT:  Thank you.

 3                 All right.  Thank you, Deputy.

 4                 THE WITNESS:  Thank you, Your Honor.

 5                 THE COURT:  Ms. Berti, do you have any other

 6      witnesses?

 7                 MS. BERTI:  No, Judge.

 8                 THE COURT:  All right.  Do you have any other

 9      evidence to present?

10                 MS. BERTI:  No, ma'am.

11                 THE COURT:  All right.  Any evidence to be presented

12      by the defense?

13                 MS. AUGUSTIN-BIRCH:  No evidence, Your Honor.

14                 THE COURT:  Okay.

15                 All right.  I will hear argument on the motion,

16      starting with Ms. Birch.

17                 MS. AUGUSTIN-BIRCH:  Your Honor, I do rely on the

18      pleading that I previously filed on behalf of Mr. Baker.  I

19      would just like to highlight some points from today's

20      testimony.

21                 The Court heard a lot today.  We heard about

22      Mr. Kane's history with law enforcement, different dates that

23      he came into contact with law enforcement.  It was for drug

24      possession; sometimes, it was for resisting an officer without

25      violence, and I would say that the elements for resisting an
```

1    officer without violence is different from fleeing or

2    attempting to flee a law enforcement officer.

3            I would also point out that out of all the charges

4    and the reports that Deputy Ridle reviewed, we did not hear at

5    any point where Mr. Kane was specifically arrested for

6    attempting to flee a law enforcement officer.

7            And I think to focus on the issue at hand is the

8    traffic violation.  By the officer's own words on the traffic

9    control chatter that we heard in court today is, "I think we

10   have PC now, we need more PC;" and the Court can definitely

11   listen to it again, if necessary.  And at the time that PC was

12   developed is for failure to maintain a single lane; and the

13   testimony that we heard today is that law enforcement officer

14   vehicles, four or five vehicles, were surrounding Mr. Kane's

15   vehicle when he swerved over, I believe, three times --

16   approximately three times, no other vehicles were struck, no

17   other vehicles had to get out of the way because of the

18   swerving.  There was no danger, there was no accident.

19           So I would submit to the Court that based on the

20   traffic law violation, specifically here, in Florida, is that

21   there was not a violation of the statute, and the failure to

22   maintain single lane alone cannot establish probable cause.

23           Now, the Government in its response referred to

24   *United States v. Mikala*, which is 286 Fed. Appx. 610, which is

25   a 2008 case from the Eleventh Circuit, but I would distinguish

1    this case with the facts at bar.  In the *Mikala* case, the

2    defendant swerved out of his lane on two different occasions

3    and almost struck another car; thus, the officer had probable

4    cause to believe that *Mikala* had committed a traffic violation,

5    and it was reasonable for the officer to stop him.  Those

6    definitely are not the facts that are before the Court today.

7          There was no violation of the statute for the stop,

8    and there was no evidence presented that, again, the vehicle

9    had to get out of the way or there was some kind of danger that

10   was created.

11         We also heard about tint today.  I would point out to

12   the Court that that information was not included in Deputy

13   Ridle's report and also the other reports that he reviewed

14   today.  I would submit that to the Court; and again, based on

15   the totality of the circumstances, the reason that that vehicle

16   was stopped on April 6, 2021, on 25th Street was because

17   Kane -- Mr. Kane allegedly had failed to maintain a single

18   lane, and I would submit to the Court that that did not occur

19   and that there was not a violation of the statute.  Therefore,

20   the firearms and the drugs that were recovered from Mr. Baker

21   should be suppressed as fruit of the poisonous tree.

22         THE COURT:  Okay, thank you.

23         MS. AUGUSTIN-BIRCH:  Thank you, Judge.

24         MS. BERTI:  So, Judge, if we actually look at the

25   motion to suppress that was filed, I mean, I think on page 5,

1    paragraph 2, Defense sort of illustrates and sort of tries to

2    distinguish that there is not an issue in this particular case,

3    and a violation didn't occur because there is no allegation of

4    drunk driving and there is no allegation that the driver was --

5    and there is no allegation that the driver was unfit to drive.

6         I think that the testimony from the witness in this

7    case and the evidence that the Government has introduced

8    through exhibits demonstrate that these deputies did have a

9    reason to believe that Mr. Kane was either under the influence

10   of something or that he was unfit to drive.

11        We see weaving which the deputy describes as being

12   between one and two feet into the right-hand lane which is a

13   substantial distance into the other lane.

14        It's not like he was just weaving within one of the

15   lanes -- the lane of travel that he was, he is actually

16   crossing into the other lane.  Understandably, this is a case

17   that is a little bit different from, you know, a singular

18   police vehicle driving behind somebody down the road who

19   observes a driving pattern, and there are civilian vehicles

20   around that.

21        In this particular case, law enforcement was driving

22   around Mr. Kane's vehicle for a specific purpose.  They were

23   positioned around the vehicle so that surveillance wouldn't be

24   observed.  The surveillance they were conducting wouldn't be

25   observed so that Mr. Kane would not be able to tell that there

1   were police vehicles following him.  They were doing it both

2   for surveillance purposes and also for safety purposes.  So

3   obviously, in a case like this, we don't -- the law does not

4   put a requirement on law enforcement that they get so close to

5   a vehicle that it somehow creates a traffic problem.  The

6   officers are not obligated to, you know, have this vehicle so

7   boxed in that he would necessarily crash into one of them.

8   They are traveling at a safe distance from him, based on the

9   fact that they know he is potentially driving under the

10  influence, but also that they are trying to conduct

11  surveillance, and they don't want him to observe them.

12          So I do think that although this isn't, you know, a

13  similar type of case the defense cites in their motion where

14  you have one officer observing a driving pattern.  In this case

15  in particular, you do have multiple officers who are observing

16  what is happening and they are purposefully staying away from

17  this vehicle.

18          I think, obviously, the biggest distinguishing factor

19  that the Government has tried to illustrate for the Court is

20  that these officers do have a belief, based on, I think, pretty

21  strong evidence and circumstantial evidence as well as direct

22  evidence that they did think that this defendant was

23  potentially under the influence of something.

24          Defense pointed out that, you know, he wasn't --

25  Mr. Kane was never written up for or arrested for fleeing, but

1    the behavior that they are observing is somebody who is

2    continually not being given the opportunity to flee from law

3    enforcement because, even back on that January 22nd traffic

4    stop, they were boxing his vehicle in because they knew sort of

5    what was going on with him.

6            So yes, I mean, I understand that this is not --

7    there was not an actual arrest for the fleeing or attempting to

8    flee, but there certainly is an arrest for resisting an officer

9    without violence, and it is based on the fact that he was

10   attempting to flee from law enforcement.

11           They don't have an obligation to let him continue to

12   drive down the road and potentially crash, when they think he

13   is under the influence of something.

14           They do have an obligation, and I'll talk about just

15   two cases here, two Florida state cases, the first one is

16   *Shively,* S-H-I-V-E-L-Y, *versus State* -- I do have a copy for

17   the Court and for Defense, if you would like one -- that's 61

18   So.3d 484, that's a 2011, Second DCA case.

19           THE COURT:  This wasn't cited in your opposition?

20           MS. BERTI:  No.

21           THE COURT:  If you are going to introduce new cases,

22   I think this is one of the instances where additional briefing

23   is going to be required.  So what I'm going to ask the parties

24   to do is, the Government to obtain a copy of the transcript of

25   today's hearing, and both parties shall file supplemental

1    briefs on the validity of the traffic stop in this case no

2    later than May 30th or May 31st -- May 31st to permit enough

3    time to obtain the transcript; and in that briefing, you can

4    cite the *Shively* case and any other authorities.

5              Ms. Birch, certainly you can refer the Court to any

6    authorities you think are pertinent.  But I do think this case

7    warrants that given sort of the multiple considerations going

8    on that perhaps motivated the stop besides the swerving

9    specifically, because the record on that particular point I

10   would say is at least factually distinguishable from the cases

11   in which that Florida statute has been used to provide PC for a

12   stop.

13             So given that, I think it would be helpful to the

14   Court to prepare that filing no later than May 31st which will

15   require necessarily a resetting of the trial in this case for a

16   period of 30 days.

17             Any objection to a 30 day continuance, Ms. Birch?

18             MS. AUGUSTIN-BIRCH:  No, Your Honor.

19             THE COURT:  Any objection to that from the

20   Government?

21             MS. BERTI:  No, ma'am.

22             THE COURT:  All right.  So we will do an order

23   resetting trial deadlines memorializing the May 31 deadline for

24   this brief I'm referencing.  And if you could please make

25   available to the Court a copy of the radio transmission, either

1    in a thumb drive or other format so I can listen to it.

2         In the future, it would be helpful to have a

3    transcript of the radio transmissions, Ms. Berti, and

4    photographs to help visualize what took place, particularly in

5    a case like this where there was a great deal of movement

6    geographically on the date in question.

7         Anything further from, Ms. Birch?

8         MS. AUGUSTIN-BIRCH:  No, Your Honor, thank you.

9         THE COURT:  Anything from the Government?

10        MS. BERTI:  I don't know -- I'm assuming Your Honor

11   doesn't necessarily need the Government to put the additional

12   cases on the record, but i did have additional argument.  I

13   don't know if Your Honor would just --

14        THE COURT:  All right.  I'll give you five more

15   minutes to finish your argument.

16        MS. BERTI:  So in addition, Judge, to the fact that,

17   you know, we do have this potential for the defendant to be

18   under the influence, I would also argue, based on how the

19   testimony came out here, there is an issue with whether or not

20   the defendant was actually seized at the point in time that the

21   traffic stop occurs.  The defendant, after he sees -- excuse

22   me, not the defendant, but the driver of the vehicle, after he

23   sees the traffic lights, the deputies' traffic lights go on, he

24   does attempt to flee.

25        After they light him up, law enforcement does have

1    reasonable suspicion to try to stop him for that fleeing and

2    alluding after the lights go on, so I do think that there is a

3    difference here also of when the actual seizure occurs because

4    he is not initially submitting to the -- to the deputies'

5    commands.

6            And then, finally, Judge, I would just also place on

7    the record that, you know, the combination of all of the things

8    that occurred here, I do think that there is an argument to be

9    made that these deputies did act in good faith.  If anything, I

10   know, you know, Defense is moving to suppress these, but I

11   don't think that suppression is the appropriate remedy here,

12   when I do think that these deputies were acting in good faith

13   based on their belief that this defendant was committing a

14   traffic violation -- multiple traffic violations and that he

15   was potentially also committing a new crime, when he fled from

16   law enforcement.

17           I think that's it.

18           THE COURT:  All right, thank you.

19           Please, when you prepare these briefs, do your best

20   to be particularized with the transcript, once you obtain it,

21   so any factual references are tied to the actual testimony or

22   to the exhibits.

23           All right.

24           MS. AUGUSTIN-BIRCH:  Your Honor, I do have a

25   question.  Is there a page limit that you want us to adhere

1    to or --

2            THE COURT:  Fifteen pages is the maximum per side.

3            MS. AUGUSTIN-BIRCH:  And I have one more question.

4    Where each of us is separately filing our own briefs, so I

5    don't have to wait for the Government to file and then I do a

6    response?

7            THE COURT:  That's correct.  It is going to be one

8    filing per side due on the same date, May 31.

9            MS. AUGUSTIN-BIRCH:  Okay, thank you.

10           THE COURT:  All right.  I have nothing further, thank

11   you.  The court is in recess.

12       (PROCEEDINGS ADJOURNED AT 12:18 P.M.)

13                    **C-E-R-T-I-F-I-C-A-T-E**

14           I hereby certify that the foregoing is

15         an accurate transcription and proceedings in the

16         above-entitled matter.

17

18   **_5/24/2022_**                    **_/s/DIANE MILLER_**
     DATE                      DIANE MILLER, RMR, CRR, CRC
                               Official Court Reporter
19                             United States District Court
                               101 South U.S. Highway 1
20                             Fort Pierce, FL  34950
                               772-467-2337

21

22

23

24

25

**BY MS.**
**AUGUSTIN-BIRC**
**H: [8]**  44/19 45/18
49/3 49/10 53/2
59/25 60/13 76/15
**BY MS. BERTI:**
**[50]**  5/11 6/21
7/15 8/16 10/21
12/9 15/18 18/3
19/13 20/14 21/15
22/15 23/8 24/2
24/11 25/16 25/23
26/10 28/1 29/22
30/2 30/11 30/23
31/11 32/9 32/25
33/10 35/1 35/9
36/4 39/24 40/3
41/6 41/13 42/18
62/7 64/3 64/21
65/10 67/8 67/20
68/8 69/3 69/24
70/13 71/6 71/13
72/9 73/25 74/25
**MS.**
**AUGUSTIN-BIRC**
**H: [39]**  3/11 4/21
6/17 7/4 9/17 9/23
15/8 20/1 20/9
40/23 44/11 44/14
44/16 45/17 48/15
48/19 48/23 49/5
49/8 53/1 59/20
59/23 61/15 61/19
62/1 68/4 71/10
72/5 73/19 76/11
77/1 77/13 77/17
79/23 83/18 84/8
85/24 86/3 86/9
**MS. BERTI: [40]**
3/6 3/25 4/5 4/9
4/12 4/15 4/18 5/3
7/9 10/7 12/6
19/11 19/21 20/5
20/11 30/10 32/23
40/1 40/19 41/2
42/16 43/1 62/5
64/1 64/19 65/7
67/3 67/25 68/6
68/15 69/16 71/4
76/3 77/7 77/10
79/24 82/20 83/21

84/10 84/16
**THE COURT:**
**[126]**
**THE**
**COURTROOM**
**DEPUTY: [3]**  3/3
5/6 69/17
**THE WITNESS:**
**[48]**  5/8 8/12 18/2
22/22 23/4 27/11
27/15 27/20 27/23
28/23 29/2 29/9
29/12 29/14 29/18
34/19 35/25 38/23
39/4 39/10 39/15
39/21 43/5 43/11
43/14 43/18 43/21
43/24 44/2 48/18
49/1 49/9 51/8
51/11 51/22 51/25
52/8 52/20 60/11
61/22 67/16 68/20
69/19 73/23 74/11
74/22 76/8 77/4

**'**

**'21 [1]**  9/16

**-**

**-- so [1]**  9/8

**/**

**/s/DIANE [1]**
86/17

**1**

**1/20 [1]**  7/18
**1/22 [1]**  9/16
**10 [1]**  36/10
**101 [3]**  1/14 1/23
86/19
**109 [1]**  1/17
**11:34 [1]**  61/23
**11:43 [1]**  61/24
**1200 [1]**  13/9
**12:18 [1]**  86/12
**14012 [1]**  3/3
**15 [1]**  36/10

**2**

**20 [3]**  1/4 3/19
7/18
**2008 [1]**  78/25
**2011 [1]**  82/18

**2021 [38]**  6/2 7/2
7/7 7/12 7/17 7/18
9/11 9/20 10/4
10/22 12/1 12/19
13/5 14/17 14/19
15/3 15/4 16/25
18/1 20/21 29/17
42/14 45/5 45/7
45/9 45/12 46/4
46/11 47/6 47/14
50/3 53/4 53/12
63/13 64/1 73/17
76/21 79/16
**2022 [2]**  1/4 86/17
**20th [3]**  9/11 45/5
46/4
**21st [1]**  22/22
**22 [2]**  9/16 12/4
**22-141012-CR-CA**
**NNON [1]**  1/2
**22-CR-14012 [1]**
3/3
**22nd [6]**  10/22
45/7 46/11 62/11
62/21 82/3
**2337 [1]**  86/20
**25th [26]**  30/14
30/15 30/17 30/18
31/17 37/11 38/22
39/5 54/11 55/2
55/14 56/3 58/5
58/8 58/14 58/17
58/23 63/21 66/20
67/18 68/16 68/22
68/23 69/6 71/23
79/16
**26 [1]**  36/17
**28 percent [1]**
36/17
**286 [1]**  78/24
**29th [5]**  28/5
28/23 29/4 29/5
54/12
**2nd [4]**  14/16
15/3 45/9 47/6

**3**

**30 [2]**  83/16 83/17
**31 [2]**  83/23 86/8
**31st [3]**  83/2 83/2
83/14
**34950 [4]**  1/15
1/18 1/24 86/20

**4**

**44 [1]**  2/4
**45 [2]**  20/22 76/8
**484 [1]**  82/18
**4900 [1]**  28/12
**4:30 [1]**  25/4
**4:45 [1]**  37/7

**5**

**5/24/2022 [1]**
86/17
**5:00 o'clock [1]**
37/7
**5th [1]**  16/9

**6**

**61 [1]**  82/17
**610 [1]**  78/24
**62 [1]**  2/5
**6th [28]**  6/2 7/12
9/20 9/24 10/4
10/19 11/2 11/3
14/24 15/4 15/10
19/5 20/21 45/12
47/14 48/14 48/22
48/23 51/7 53/4
53/12 63/10 63/13
64/1 64/14 65/20
73/8 76/21

**7**

**76 [1]**  2/6
**772-467-2337 [1]**
86/20

**9**

**97 [1]**  1/7

**A**

**A.M [2]**  61/23
61/24
**about and [1]**
36/21
**above [2]**  63/1
86/16
**above-entitled [1]**
86/16
**above-referenced**
**[1]**  63/1
**Absolutely [3]**
37/24 70/1 76/2
**accelerate [2]**
52/12 71/16

**accident [1]**
78/18
**acknowledged [2]**
62/16 63/2
**acquired [1]**  42/6
**across [1]**  66/16
**act [1]**  85/9
**acting [1]**  85/12
**actions [1]**  62/21
**activated [7]**
43/17 52/7 59/1
59/2 59/3 70/7
71/14
**activating [1]**
52/8
**activity [1]**  16/12
**actuality [1]**  66/9
**addition [3]**  37/20
63/16 84/16
**address [4]**  71/25
72/1 73/12 74/10
**adhere [1]**  85/25
**ADJOURNED [1]**
86/12
**admission [1]**
19/24
**admitted [6]**  20/2
20/4 40/24 41/1
68/13 68/17
**affidavit [5]**  47/22
48/12 48/13 48/21
62/20
**AFPD [1]**  1/16
**Agent [1]**  3/8
**AILEEN [1]**  1/10
**air [1]**  35/22
**alcohol [3]**  75/20
75/20 75/21
**alert [1]**  66/7
**alerted [1]**  17/3
**allegation [3]**
80/3 80/4 80/5
**allegedly [2]**
57/23 79/17
**alley [1]**  23/16
**allows [1]**  36/20
**alluding [1]**  85/2
**almost [2]**  9/24
79/3
**alone [1]**  78/22
**although [1]**
81/12
**AMERICA [1]**  1/4

## A

angle [1]  10/1
answer [1]  73/22
appearances [2]
1/12 3/5
approach [9]
19/11 40/1 43/25
48/15 49/5 59/5
64/19 65/7 67/6
approached [2]
43/24 44/7
Appx [1]  78/24
April 2021 [1]
29/17
April 6 [7]  7/7
12/1 13/5 16/25
42/14 50/3 79/16
April 6th [25]  6/2
7/12 9/20 9/24
10/4 10/19 15/4
15/10 19/5 20/21
45/12 47/14 48/14
48/22 48/23 51/7
53/4 53/12 63/10
63/13 64/1 64/14
65/20 73/8 76/21
area [24]  11/4
12/25 18/17 22/18
22/21 28/9 28/14
28/15 28/16 28/21
28/22 29/1 29/23
37/15 37/16 39/14
39/15 54/7 54/13
54/14 55/1 72/10
72/13 74/11
argue [1]  84/18
argument [5]
9/25 77/15 84/12
84/15 85/8
arrest [36]  7/6 7/9
7/19 7/22 8/5 8/8
9/11 9/19 10/23
10/24 11/24 12/4
12/12 12/15 12/24
13/5 13/12 13/15
13/19 13/20 13/22
14/16 14/19 15/4
17/20 17/21 47/1
47/22 48/13 48/21
48/23 51/5 62/20
64/14 82/7 82/8
arrested [30]  6/14
6/18 6/22 6/25 7/3
7/16 9/12 11/25
12/18 17/16 42/9
42/9 46/4 46/9
46/11 47/6 47/9
47/11 47/14 47/17
47/19 48/3 48/7
49/13 50/2 63/15
65/21 73/2 78/5
81/25
arresting [2]
11/24 41/24
arrests [2]  10/3
17/16
artificial [1]  10/17
as what [1]  75/9
asleep [2]  66/2
75/11
asphalt [1]  27/7
assigned [2]  5/16
12/14
assist [1]  50/12
assume [2]  4/16
4/25
assuming [2]
17/20 84/10
assumption [3]
55/18 55/20 65/25
ATF [1]  3/8
Atlantic [1]  23/17
attempt [7]  46/1
66/21 67/22 70/8
71/17 71/20 84/24
attempted [10]
11/8 11/15 44/3
44/3 51/25 52/12
59/9 63/3 71/9
71/16
attempted to [1]
71/9
attempting [18]
43/7 45/23 45/24
46/9 46/20 47/11
47/19 48/7 49/13
51/22 51/23 63/21
64/6 71/8 78/2
78/6 82/7 82/10
Attorney [1]  1/14
Attorney's [1]  3/9
audio [20]  20/13
20/23 21/14 22/14
22/25 24/1 24/10
25/15 25/22 26/9

27/16 27/25 30/1
30/9 30/22 31/10
32/8 32/24 33/9
34/25
AUGUSTIN [4]
1/16 2/4 2/6 3/12
AUGUSTIN-BIRC
H [4]  1/16 2/4 2/6
3/12
AUSA [2]  1/13
1/13
authorities [2]
83/4 83/6
Avenue [21]  11/5
23/17 28/4 28/23
30/6 30/13 32/14
32/17 32/20 32/22
54/10 58/9 58/12
71/21 72/1 72/10
72/17 73/12 73/18
74/10 74/21

## B

backing [1]  25/25
backseat [1]  9/5
bag [6]  51/15
51/16 51/16 65/4
65/4 65/5
baggy [3]  8/19
13/24 14/6
BAKER [17]  1/6
3/4 3/12 3/15 6/19
10/8 33/17 33/19
40/16 40/16 41/11
41/21 42/9 44/8
55/11 77/18 79/20
Baker's [1]  40/10
bar [1]  79/1
basis [3]  10/16
15/13 51/21
bearing [2]  6/19
9/19
beforehand [1]
29/13
behavior [2]  63/9
82/1
behind [9]  28/19
31/22 31/24 38/2
39/17 59/17 63/3
70/5 80/18
belief [5]  15/15
71/8 72/23 81/20
85/13

bench [3]  12/12
12/15 12/18
BERTI [13]  1/13
2/3 2/5 3/6 3/24
5/1 7/8 10/5 35/7
40/13 56/19 77/5
84/3
besides [2]  43/23
83/8
biggest [1]  81/18
BIRCH [11]  1/16
2/4 2/6 3/12 3/14
4/17 52/25 77/16
83/5 83/17 84/7
Birch's [1]  10/6
block [2]  11/9
52/17
blocked [1]  37/2
blue [2]  70/2
71/14
blunt [3]  11/12
11/15 63/6
bongs [1]  21/24
bottle [4]  51/14
51/15 65/2 65/3
box [5]  44/4 65/1
65/11 65/12 70/16
boxed [3]  43/8
64/5 81/7
boxing [1]  82/4
brain [1]  75/22
brief [2]  75/25
83/24
briefing [2]  82/22
83/3
briefs [3]  83/1
85/19 86/4
brown [3]  11/19
51/16 65/4
buprenorphine
[1]  9/9
burn [2]  8/15
14/14
burned [1]  9/6
burnt [1]  9/7
business [4]  7/21
8/1 8/1 23/19
busy [2]  37/10
37/13
butane [1]  63/6
button [1]  21/7

## C

C-E-R-T-I-F-I-C-A-
T-E [1]  86/13
Callahan [6]  3/8
15/20 15/24 15/25
16/17 24/23
CANNON [3]  1/2
1/10 56/1
cap [2]  51/15 65/4
capped [1]  9/5
capsule [1]  14/10
capsules [3]
11/17 11/19 11/20
car [11]  6/5 27/3
27/10 31/20 43/20
43/23 52/13 66/13
66/23 67/1 79/3
cars [7]  6/5 38/21
43/19 52/23 58/13
59/10 68/22
cellphone [3]
35/13 35/14 35/18
center [3]  14/5
33/6 64/24
certify [1]  86/14
chance [1]  63/13
Chapstick [1]
14/9
characterize [1]
32/2
characterized [1]
62/10
charge [1]  49/1
charged [2]  47/21
49/14
charges [8]  13/16
42/4 42/5 42/7
46/20 48/3 63/16
78/3
chatter [1]  78/9
Chevy [3]  6/9
33/23 34/17
cigarette [3]
11/14 14/5 14/9
circles [2]  70/14
70/25
Circuit [1]  78/25
circumstances
[12]  7/11 7/19
9/22 10/16 10/23
13/19 13/22 15/13
37/18 42/3 73/15

# C

**circumstances...** [1] 79/15
**circumstantial** [1] 81/21
**citation** [2] 41/21 43/14
**cite** [1] 83/4
**cited** [2] 3/22 82/19
**cites** [1] 81/13
**City** [3] 28/12 28/13 74/13
**civilian** [6] 31/20 31/25 36/1 39/16 39/22 80/19
**classic** [1] 17/22
**classified** [1] 75/9
**classify** [1] 75/8
**clear** [3] 14/6 68/12 72/8
**clients** [1] 16/1
**close** [8] 25/8 37/1 43/25 56/12 66/9 66/23 66/25 81/4
**closed** [1] 24/25
**closely** [1] 36/24
**closer** [3] 8/11 58/19 66/15
**closest** [1] 28/24
**coherent** [1] 75/24
**column** [1] 35/16
**combination** [2] 65/19 85/7
**commands** [1] 85/5
**committed** [1] 79/4
**committing** [2] 85/13 85/15
**common** [2] 38/5 74/12
**comparable** [1] 37/16
**conceal** [1] 11/15
**conduct** [7] 18/5 18/5 50/5 50/23 63/1 70/8 81/10
**conducted** [12]

10/24 33/21 41/10 43/4 53/17 53/22 54/5 54/8 54/17 54/24 64/23 69/5
**conducting** [1] 80/24
**confirm** [1] 26/24
**confusing** [1] 72/8
**considerations** [1] 83/7
**consistent** [1] 25/5
**console** [2] 14/5 64/24
**consume** [1] 75/20
**contained** [8] 13/25 14/6 14/10 40/8 51/15 64/24 65/1 65/3
**container** [1] 64/24
**containing** [1] 8/19
**contains** [1] 46/1
**continually** [1] 82/2
**continuance** [1] 83/17
**continuing** [1] 10/1
**contraband** [1] 11/10
**control** [2] 56/19 78/9
**controlled** [6] 7/23 11/10 48/5 49/19 53/10 76/20
**counteract** [1] 75/12
**counts** [1] 47/7
**County** [7] 4/1 4/10 5/4 5/13 5/16 6/15 6/23
**court** [61] 1/1 1/22 1/23 3/13 4/15 4/20 4/22 7/6 10/23 12/11 15/6 15/21 20/5 20/13 20/19 21/14 22/14 22/25 24/1 24/10 25/15 25/22 26/9

27/16 27/25 30/1 30/9 30/22 31/10 31/15 32/8 32/24 33/9 34/1 34/25 41/2 41/5 41/8 41/12 41/16 56/20 59/10 68/10 69/12 72/20 77/21 78/9 78/10 78/19 79/6 79/12 79/14 79/18 81/19 82/17 83/5 83/14 83/25 86/11 86/18 86/19
**courthouse** [24] 23/13 23/20 23/20 23/23 24/17 24/17 24/20 24/22 25/3 25/7 25/12 25/18 25/19 26/4 28/3 38/5 42/20 53/19 57/12 66/16 66/17 72/17 73/12 74/13
**CR** [2] 1/2 3/3
**crash** [2] 81/7 82/12
**crashing** [1] 52/5
**CRC** [1] 86/18
**created** [2] 52/18 79/10
**creates** [1] 81/5
**crime** [3] 29/2 29/3 85/15
**crimes** [1] 7/22
**criminal** [1] 15/6
**cross** [11] 2/4 22/16 23/17 28/24 43/3 44/10 44/18 52/25 62/9 62/17 71/18
**cross-examinatio n** [8] 2/4 43/3 44/10 44/18 52/25 62/9 62/17 71/18
**crossing** [2] 33/6 80/16
**CRR** [2] 1/22 86/18
**crystal** [4] 8/23 8/24 9/1 11/18
**crystal-like** [4] 8/23 8/24 9/1 11/18
**crystals** [2] 51/17

65/5

# D

**D-A-N-I-E-L** [1] 12/7
**D-E-T-R-O-X** [2] 64/25 64/25
**danger** [3] 39/19 78/18 79/9
**Daniel** [1] 12/7
**dark** [8] 33/13 33/16 33/17 34/3 41/17 55/5 58/3 61/13
**dash** [1] 64/25
**DCA** [1] 82/18
**deadline** [1] 83/23
**deadlines** [1] 83/23
**dealt** [1] 17/12
**decided** [1] 66/20
**decides** [1] 18/4
**defendant** [10] 1/7 1/16 3/22 79/2 81/22 84/17 84/20 84/21 84/22 85/13
**defendant's** [1] 3/18
**defendants** [1] 73/2
**Defender** [1] 1/17
**defense** [1] 67/4 77/12 80/1 81/13 81/24 82/17 85/10
**delay** [2] 38/11 38/14
**delayed** [2] 38/6 75/18
**demonstrate** [2] 69/19 80/8
**dents** [1] 6/12
**department** [1] 60/22
**depending** [1] 66/14
**depict** [1] 52/24
**depiction** [3] 40/14 68/11 70/14
**Depot** [1] 23/17
**deputies** [14] 10/9 11/6 11/16 18/25 21/9 23/9

24/3 24/22 35/2 36/12 72/2 80/8 85/9 85/12
**deputies'** [2] 84/23 85/4
**deputy** [66] 2/2 4/9 5/4 5/5 7/1 7/1 7/11 7/20 7/25 8/7 8/7 8/9 8/13 9/4 9/7 9/8 10/24 11/23 11/25 12/4 13/2 14/15 16/16 16/20 16/24 17/3 17/7 18/4 21/19 22/3 22/16 23/5 24/23 25/10 25/17 25/19 26/12 26/21 26/23 27/4 30/3 30/24 31/1 31/6 31/23 32/11 33/11 33/14 36/6 41/25 44/23 44/24 44/24 45/21 47/24 48/20 52/10 60/6 63/15 63/19 68/18 76/18 77/3 78/4 79/12 80/11
**description** [1] 68/14
**destroy** [1] 11/15
**detective** [28] 12/24 21/19 23/5 27/20 27/20 27/21 31/1 31/6 31/9 31/21 31/21 31/24 36/2 41/10 43/5 44/20 44/22 52/10 62/8 62/25 67/9 70/19 70/22 70/23 70/24 71/2 71/7 71/17
**detectives** [3] 11/6 18/25 24/22
**detention** [1] 3/21
**determined** [1] 63/14
**detox** [1] 22/1
**Detrox** [1] 64/24
**develop** [1] 67/22
**developed** [1] 78/12
**developing** [1] 13/16

**D**

diane [4]  1/22
1/24 86/17 86/18
difference [1]
85/3
difficult [2]  41/19
50/13
direct [8]  2/3 5/10
20/6 45/1 48/2
53/3 54/1 81/21
direction [2]  22/6
30/15
discover [1]
43/22
discovery [1]
4/19
discussion [1]
57/4
distance [4]  67/2
69/7 80/13 81/8
distances [2]
66/5 66/22
distinguish [2]
78/25 80/2
distinguishable
 [1]  83/10
distinguishing [1]
81/18
DISTRICT [5]  1/1
1/1 1/10 1/23
86/19
division [7]  1/2
5/19 5/21 18/12
29/8 29/11 75/3
Docket [1]  3/19
Double [1]  64/25
downer [1]  75/8
downtown [1]
23/22
draw [4]  52/20
69/11 69/18 70/25
drawn [1]  59/8
drink [1]  65/16
drinking [1]  75/20
driver [4]  63/2
80/4 80/5 84/22
driver's [1]  31/7
driveway [2]  30/4
30/5
drove [4]  6/5 6/9
6/10 52/1
drowsy [1]  75/11

drug [46]  6/14
6/23 7/9 8/18 8/21
15/5 15/9 15/19
15/22 16/1 16/7
16/8 17/10 22/1
24/18 24/20 24/24
25/6 28/16 42/12
42/12 46/5 46/7
46/14 46/16 47/7
47/9 47/15 48/6
51/5 51/5 63/16
64/9 65/12 65/14
65/15 72/18 72/21
73/3 73/7 73/8
74/7 74/12 74/14
74/17 77/23
drunk [1]  80/4
DUI [4]  41/25 42/5
49/22 49/24
Durin [3]  7/1 7/20
8/13
Durin's [1]  8/9

**E**

east [1]  24/8
echo [1]  32/23
effect [3]  38/7
38/16 75/21
effects [1]  38/8
effectuated [1]
76/7
eight [2]  5/22
66/13
elements [1]
77/25
Eleventh [1]
78/25
eliminate [1]
10/18
Elmo [2]  69/14
69/15
eluding [1]  47/4
emergency [7]
43/6 52/8 59/2
59/3 62/25 70/8
71/14
encircling [1]
43/19
encounter [3]
9/12 14/20 16/24
enforcement [49]
8/3 9/13 15/14
27/18 29/17 33/19

38/21 45/2 45/15
45/22 45/24 46/2
47/12 50/5 50/10
50/23 53/7 53/12
55/4 56/2 56/12
56/16 56/21 57/5
57/12 57/15 57/19
59/5 60/19 64/4
69/4 70/3 71/9
71/19 73/14 75/2
76/19 76/23 77/22
77/23 78/2 78/6
78/13 80/21 81/4
82/3 82/10 84/25
85/16
entail [1]  18/6
enter [1]  3/4
enters [1]  75/19
entitled [1]  86/16
Entry [1]  3/19
equipment [1]
22/1
especially [2]
37/10 64/7
essentially [5]
18/4 38/13 40/15
59/11 62/22
establish [3]
22/19 66/12 78/22
established [3]
7/22 11/1 14/4
establishing [1]
66/11
estimate [1]  76/8
EVAN [5]  2/2 4/9
5/4 5/5 5/8
evidence [18]
19/20 19/22 20/4
40/12 40/20 41/1
46/12 67/19 68/1
68/17 77/9 77/11
77/13 79/8 80/7
81/21 81/21 81/22
examination [19]
2/3 2/4 2/5 2/6
5/10 20/7 43/3
44/10 44/18 45/1
48/2 52/25 53/3
54/1 62/6 62/9
62/17 71/18 76/14
excuse [3]  9/8
72/1 84/21
execute [2]  12/14

13/12
executed [1]
12/21
exercises [2]
50/14 51/1
exit [3]  24/3 25/17
25/19
exited [2]  44/6
59/5
exiting [1]  52/17
exits [1]  24/17
experience [3]
38/6 73/14 75/2
experiences [1]
6/11
extremely [1]
41/19
extricate [1]
10/18
eyes [1]  66/1

**F**

face [1]  27/6
facility [1]  25/6
fact [6]  61/7
63/15 73/6 81/9
82/9 84/16
factor [1]  81/18
facts [6]  10/2
61/4 61/6 61/7
79/1 79/6
factual [2]  3/20
85/21
factually [1]
83/10
fail [1]  65/15
failed [4]  16/7
17/10 74/17 79/17
failing [5]  33/5
38/16 39/10 39/11
39/12
fails [2]  16/1
57/23
failure [3]  61/10
78/12 78/21
faith [2]  85/9
85/12
fall [2]  66/2 75/11
familiarize [1]
67/10
faster [1]  75/17
February 2 [3]
12/19 14/19 18/1

February 2nd [4]
14/16 15/3 45/9
47/6
Fed [1]  78/24
felony [4]  42/4
42/5 42/7 49/19
fentanyl [14]
11/22 14/10 51/16
51/16 65/4 65/5
74/8 75/8 75/10
75/18 75/18 75/23
75/25 76/1
field [8]  11/12
11/20 11/21 13/25
14/6 14/10 50/5
63/7
Fifteen [1]  86/2
fifth [1]  70/18
file [2]  82/25 86/5
finally [1]  85/6
finger [1]  35/22
fingers [1]  55/19
finish [1]  84/15
firearms [1]  79/20
FL [1]  86/20
fled [1]  85/15
flee [26]  11/8 43/7
43/9 44/3 45/23
45/24 46/2 46/9
46/20 47/11 47/19
48/7 49/13 51/22
51/23 59/9 63/21
64/6 71/9 71/17
78/2 78/6 82/2
82/8 82/10 84/24
fleeing [8]  45/15
45/22 47/3 62/9
78/1 81/25 82/7
85/1
FLORIDA [10]  1/1
1/5 1/15 1/18 1/24
36/15 46/1 78/20
82/15 83/11
flsd.uscourts.gov
 [1]  1/24
flush [2]  64/25
65/14
focus [2]  7/7 78/7
focused [1]  34/15
focusing [1]  10/5
follow-up [1]
76/12
foot [1]  51/24

## F

foregoing [1] 86/14
format [1] 84/1
FORT [14] 1/2 1/5 1/15 1/18 1/24 22/22 23/22 28/5 53/20 54/14 57/18 57/19 68/16 86/20
frequency [2] 19/1 23/3
frequently [2] 5/23 17/9
front [28] 8/20 14/23 31/14 32/1 34/5 34/13 35/11 35/23 35/25 36/1 36/3 37/2 38/20 39/17 47/16 47/23 48/9 52/2 52/9 52/13 58/6 58/14 59/14 62/13 63/23 70/6 70/22 71/1
fruit [1] 79/21

## G

gang [5] 28/17 29/4 29/4 29/5 72/14
gap [2] 21/11 52/17
garage [4] 24/7 24/15 54/3 54/7
gas [1] 13/10
gaze [1] 50/20
gear [1] 8/24
gel [2] 51/15 65/4
general [2] 22/21 74/11
geographically [1] 84/6
gets [1] 30/15
government [21] 1/13 3/5 3/23 5/5 9/25 12/6 19/20 19/21 20/19 40/12 40/19 52/23 67/25 78/23 80/7 81/19 82/24 83/20 84/9 84/11 86/5
Government's [13] 19/14 19/23 19/25 20/2 20/4

40/5 40/21 40/24 67/4 67/9 68/2 68/12 68/17
gram [1] 51/18
granted [1] 41/4
great [1] 84/5
gun [2] 28/16 72/14
guns [1] 59/8

## H

half-mile [2] 39/7 69/9
hearing [5] 3/21 21/9 27/19 60/17 82/25
heavy [1] 66/14
helpful [3] 52/21 83/13 84/2
hereby [1] 86/14
highlight [1] 77/19
highly [1] 7/10
Highway [2] 1/23 86/19
hired [1] 60/22
history [6] 43/7 45/14 45/22 62/9 64/6 77/22
hit [2] 38/7 75/17
hold [1] 17/23
holding [3] 14/6 35/20 68/9
honest [1] 65/18
Honor [36] 3/11 4/21 6/17 7/4 9/17 9/23 15/8 20/1 20/9 40/23 43/21 44/11 44/16 48/15 48/20 48/24 49/6 51/12 53/1 59/20 61/16 61/22 62/1 68/4 71/10 72/5 73/19 76/11 77/4 77/13 77/17 83/18 84/8 84/10 84/13 85/24
HONORABLE [1] 1/10
horizontal [1] 50/20
Hospital [2] 58/19 58/24

hour [2] 37/17 76/9
house [3] 32/14 32/16 32/20
Hwy [1] 1/14
hydrochloride [1] 9/10
hypodermic [2] 51/13 65/2

## I

I-N-D-E-X [1] 1/25
identification [4] 19/22 40/20 67/5 68/2
idling [1] 42/23
ignition [1] 42/24
illegal [4] 36/13 36/16 41/20 41/21
illustrate [1] 81/19
illustrates [1] 80/1
immediately [1] 73/3
importance [1] 61/3
indicative [1] 66/3
indicia [1] 8/18
influence [13] 10/12 15/16 17/18 37/22 50/24 65/23 71/22 72/4 80/9 81/10 81/23 82/13 84/18
information [6] 10/14 10/15 12/23 16/17 74/21 79/12
informed [1] 16/7
infractions [1] 63/1
ingest [2] 75/6 76/24
ingested [1] 76/1
initially [3] 26/21 38/7 85/4
initiate [1] 67/22
initiated [8] 11/7 13/10 30/19 43/6 43/8 43/10 52/12 62/25
ink [1] 69/10

inside the [1] 64/23
instance [2] 21/17 23/4
instances [1] 82/22
interaction [1] 74/2
interactions [4] 10/11 38/1 50/9 73/17
interrupt [2] 13/2 18/9
intersection [8] 11/3 11/5 37/8 58/18 67/17 68/15 69/1 69/8
intoxicated [1] 38/2
introduce [1] 82/21
introduced [1] 80/7
inventory [1] 9/3
inventorying [1] 9/9
investigated [2] 49/22 73/3
investigation [2] 41/25 50/12
investigations [4] 5/18 11/7 18/11 29/3
Investigative [1] 29/10
invoke [1] 4/22
invoked [1] 4/24
Island [4] 34/20 39/6 58/17 69/6
issue [6] 6/1 10/17 38/19 78/7 80/2 84/19
issued [4] 12/12 41/21 43/13 43/15
item [1] 11/15
items [2] 64/9 65/1

## J

January 20th [3] 9/11 45/5 46/4
January 22 [1] 12/4

January 22nd [6] 10/22 45/7 46/11 62/11 62/21 82/3
Jeep [3] 6/8 10/25 11/3
Jordan [33] 6/2 6/3 7/21 8/2 8/2 10/8 10/25 12/23 16/5 16/7 16/9 16/14 17/4 17/9 21/22 22/18 26/14 26/15 27/5 31/3 31/18 34/15 43/6 50/10 51/14 52/12 52/14 52/17 63/2 65/3 67/23 68/24 71/16
judge [22] 1/10 3/6 12/12 12/20 19/21 35/7 36/21 40/1 40/19 41/3 42/16 43/2 56/1 62/5 67/25 71/4 77/1 77/7 79/23 79/24 84/16 85/6
Judge's [1] 13/12

## K

Kane [134]
Kane's [42] 7/5 8/7 9/18 12/25 17/4 23/14 25/11 27/5 29/23 31/14 31/18 32/3 34/5 42/19 42/22 43/20 52/14 52/17 53/7 55/13 56/5 56/8 56/13 56/17 58/4 59/6 59/14 59/17 64/10 64/11 66/10 69/13 69/20 70/1 70/10 70/16 71/1 71/20 76/6 77/22 78/14 80/22
keys [1] 21/5
knowing [2] 17/9 17/10
Kristin [2] 15/20 24/23
KWUAN [3] 1/6 3/4 3/12

**L**

lane [28] 31/17
31/18 31/19 33/5
34/21 34/22 34/23
37/12 38/17 38/18
39/11 39/11 39/13
52/15 52/16 57/24
61/10 68/25 70/2
70/5 78/12 78/22
79/2 79/18 80/12
80/13 80/15 80/16
lanes [5] 37/11
37/12 39/19 68/24
80/15
language [1]
56/20
law [53] 8/2 9/12
15/14 23/18 27/18
29/16 33/19 38/21
45/2 45/15 45/22
45/24 46/2 47/11
50/5 50/10 50/23
53/6 53/12 55/4
56/2 56/11 56/15
56/21 57/4 57/12
57/15 57/19 59/5
60/19 62/17 64/4
69/4 70/2 71/9
71/19 73/14 75/2
76/19 76/23 77/22
77/23 78/2 78/6
78/13 78/20 80/21
81/3 81/4 82/2
82/10 84/25 85/16
Lawnwood [2]
58/19 58/23
layout [1] 69/22
leading [1] 10/16
lean [1] 27/5
leaning [1] 26/22
led [1] 71/21
left-hand [2]
52/14 52/15
leg [1] 50/18
lengths [3] 66/13
66/23 67/1
light [8] 35/3
36/20 58/8 58/15
58/16 58/21 58/23
84/25
lights [15] 43/6
43/8 43/10 43/17

52/7 52/8 59/2
59/3 62/25 70/8
71/14 71/15 84/23
84/23 85/2
limit [1] 85/25
Lincoln [1] 54/15
listen [3] 19/7
78/11 84/1
listened [1] 19/18
listening [1] 10/2
location [5] 22/5
24/8 30/12 67/21
69/21
Lopez [1] 25/19
Lucie [7] 4/1 4/9
5/4 5/13 5/16 6/15
6/23
LUISA [2] 1/13
3/6

**M**

M-O-N-D-R-A-G-O
-N [1] 27/23
maintain [10]
33/5 38/16 39/10
39/11 39/13 57/23
61/10 78/12 78/22
79/17
maintaining [1]
75/13
major [1] 29/3
marijuana [2]
11/12 11/15
Martinez [1]
62/25
Masks [1] 3/16
materials [1] 4/17
matter [1] 86/16
maximum [1]
86/2
May 30th or [1]
83/2
May 31 [1] 83/23
May 31st [3] 83/2
83/2 83/14
MDMA [6] 11/12
11/13 11/14 11/21
63/7 74/6
MDMA/Molly [1]
63/7
MDPV [5] 14/1
14/7 51/17 65/6
74/6

MDPV/Molly [4]
14/1 14/7 51/17
65/6
medication [1]
9/10
members [4] 5/20
5/22 28/17 29/4
memorializing [1]
83/23
memory [2] 48/11
49/11
Metro [1] 13/10
mic [1] 67/15
MICHAEL [2] 1/13
3/8
microphone [3]
8/11 21/6 21/8
middle [3] 37/12
70/19 75/12
Midway [2] 13/9
28/13
Mikala [3] 78/24
79/1 79/4
mile [3] 30/20
39/7 69/9
miles [1] 30/20
miller [4] 1/22
1/24 86/17 86/18
minimum [1]
66/13
misdemeanor [5]
42/5 49/15 49/17
49/24 51/20
misdemeanors
[1] 50/3
mispronounce [1]
60/6
misquote [1]
64/16
Molly [11] 11/13
11/13 14/1 14/7
51/17 63/7 65/6
74/6 75/8 75/11
75/16
moment [6] 9/8
42/16 44/11 59/21
61/15 71/4
moments [3]
39/12 40/15 71/19
Mondragon [4]
27/20 31/22 31/24
43/5
Mondragon's [2]

27/22 70/20
months [1] 10/3
MONTRELL [2]
1/6 3/4
motion [7] 1/9
3/18 3/19 6/19
77/15 79/25 81/13
motivated [1]
83/8
motor [1] 10/8
movement [2]
38/25 84/5
movements [1]
52/22
Mr [2] 3/15 21/23
Mr. [153]
Mr. Baker [13]
6/19 10/8 33/17
33/19 40/16 40/16
41/11 41/21 42/9
44/8 55/11 77/18
79/20
Mr. Baker's [1]
40/10
Mr. Kane [99]
Mr. Kane's [36]
7/5 8/7 9/18 23/14
25/11 29/23 31/14
32/3 34/5 42/19
42/22 43/20 53/7
55/13 56/5 56/8
56/13 56/17 58/4
59/6 59/14 59/17
64/10 64/11 66/10
69/13 69/20 70/1
70/10 70/16 71/1
71/20 76/6 77/22
78/14 80/22
Mr. Mondragon's
[1] 27/22
Mr. Ridle [3] 4/25
45/14 45/16
Mrs. [1] 7/8
Mrs. Berti [1] 7/8
Ms [16] 2/3 2/4
2/5 2/6 3/14 4/17
5/1 15/24 15/25
35/7 40/13 52/25
77/5 77/16 83/17
84/3
Ms. [7] 3/24 10/5
10/6 16/17 56/19
83/5 84/7

Ms. Berti [3] 3/24
10/5 56/19
Ms. Birch [2] 83/5
84/7
Ms. Birch's [1]
10/6
Ms. Callahan [1]
16/17
multiple [5] 11/16
34/19 81/15 83/7
85/14
muted [1] 41/7

**N**

narcotic [4] 7/24
16/12 38/8 76/24
narcotics [27]
5/18 5/21 8/6 8/17
10/12 14/11 16/3
16/15 16/22 17/8
17/9 17/11 17/13
17/18 18/11 19/1
38/15 38/15 42/13
72/14 73/24 74/3
74/5 74/10 74/16
74/19 75/3
narrative [1] 39/1
nature [1] 22/2
near [4] 8/23
12/25 28/2 42/20
necessary [1]
78/11
needle [2] 51/13
65/2
needles [3] 8/14
9/5 14/13
neighborhood [2]
54/15 74/18
Nicole [1] 3/8
ninth [1] 54/13
nodding [3] 17/23
38/3 66/1
north [10] 1/17
28/4 28/5 28/23
54/10 54/12 54/14
57/19 58/17 68/23
notify [2] 16/3
16/4
Number [4] 19/15
40/5 67/4 67/10

**O**

o'clock [1] 37/7

**O**

**O-S-T-E-E-N [1]**
13/3

**object [3]**  7/5
9/18 15/8

**objection [17]**
6/17 7/13 10/6
15/12 19/24 20/3
20/8 40/22 40/25
68/3 68/13 71/10
72/5 73/19 73/21
83/17 83/19

**objections [1]**
15/10

**obligated [1]**  81/6

**obligation [2]**
82/11 82/14

**observations [1]**
39/2

**observe [11]**  14/2
17/17 18/17 33/15
34/8 35/6 35/10
41/15 41/17 66/18
81/11

**observed [22]**  8/7
9/5 11/2 13/9 17/4
25/19 25/25 27/4
33/16 36/11 36/22
37/19 40/9 53/15
53/19 53/24 55/4
55/16 76/20 76/24
80/24 80/25

**observes [2]**  22/4
80/19

**observing [11]**
20/25 25/3 26/13
33/7 37/4 38/10
41/8 73/16 81/14
81/15 82/1

**obtain [3]**  82/24
83/3 85/20

**obtained [1]**
12/23

**occasions [1]**
79/2

**occupant [1]**
43/23

**occupants [1]**
34/4

**office [12]**  1/14
1/17 3/9 4/1 4/10
5/4 5/13 5/17 7/3

23/18 60/22 63/3

**officer [33]**  11/24
15/20 15/23 15/24
16/20 16/21 23/2
25/11 46/18 46/20
46/24 47/12 47/19
48/7 49/13 53/7
60/5 60/20 62/18
63/16 73/15 75/3
76/19 76/23 77/24
78/1 78/2 78/6
78/13 79/3 79/5
81/14 82/8

**officer's [2]**  9/22
78/8

**officers [7]**  45/22
45/24 50/23 59/5
81/6 81/15 81/20

**officers' [1]**  56/12

**Official [2]**  1/22
86/18

**Okeechobee [6]**
22/22 34/20 39/5
67/17 68/16 68/21

**one-leg [1]**  50/18

**open [22]**  20/13
21/14 22/14 22/25
24/1 24/10 25/15
25/22 26/9 27/5
27/16 27/25 30/1
30/9 30/22 31/10
32/8 32/24 33/9
34/25 41/5 41/12

**operating [3]**
10/7 27/12 54/2

**operator [1]**
15/15

**opinion [1]**  71/7

**opioid [1]**  66/3

**opioids [2]**  17/22
38/5

**opportunity [4]**
19/7 60/16 64/7
82/2

**opposed [1]**
75/18

**opposition [2]**
3/20 82/19

**optional [1]**  3/16

**Orange [2]**  28/4
54/10

**order [1]**  83/22

**Osteen [11]**  12/24

13/2 21/19 23/6
27/21 31/1 31/6
32/11 41/11 70/23
71/7

**Osteen's [7]**
31/19 31/21 36/2
70/22 70/24 71/2
71/17

**overall [1]**  4/2

**overrule [3]**  7/13
15/12 73/21

**Overruled [1]**
6/20

**P**

**P-R-O-C-E-E-D-I-
N-G-S [1]**  2/7

**P.M [2]**  25/4
86/12

**pack [2]**  14/5 14/9

**page [4]**  2/1
64/22 79/25 85/25

**pages [2]**  1/7
86/2

**PANAYOTTA [1]**
1/16

**Panoyotta [1]**
3/12

**paragraph [1]**
80/1

**paraphernalia
[14]**  7/24 8/18
8/21 14/11 42/12
46/7 46/16 47/9
47/17 48/6 49/17
51/6 64/9 65/12

**Park [1]**  54/16

**parked [7]**  23/16
27/11 27/13 27/13
42/24 54/2 66/15

**parking [19]**
23/13 23/16 23/18
23/19 24/7 24/14
26/1 26/7 26/7
26/16 26/17 26/18
26/19 27/14 28/2
38/4 42/20 54/3
54/7

**Parkway [1]**  11/3

**part [5]**  3/23
10/15 50/13 50/22
60/25

**partially [1]**  41/18

**participate [1]**
22/8

**particularized [1]**
85/20

**parties [3]**  3/4
82/23 82/25

**pass [2]**  22/1
65/14

**passenger [4]**
31/8 34/12 41/11
44/7

**patrol [5]**  29/14
52/2 52/3 52/16
63/23

**pattern [4]**  36/22
59/11 80/19 81/14

**patterns [3]**  37/14
39/3 66/14

**pause [5]**  20/15
21/16 30/10 32/10
35/2

**pausing [1]**  41/14

**PC [8]**  32/12
56/24 57/2 62/22
78/10 78/10 78/11
83/11

**pen [1]**  69/11

**people [3]**  36/6
38/5 75/9

**perceive [1]**
39/18

**percentage [3]**
36/15 36/16 36/19

**perhaps [1]**  83/8

**perimeter [2]**
18/12 18/15

**period [9]**  42/20
72/11 72/23 73/7
73/9 75/15 75/21
75/25 83/16

**permission [5]**
41/2 41/4 64/19
65/7 67/6

**permit [1]**  83/2

**person [5]**  7/20
8/1 8/2 10/7 16/4

**pertinent [1]**  83/6

**phone [10]**  35/15
35/20 35/22 40/10
55/10 55/11 55/13
55/18 58/3 58/4

**phonetic [1]**
15/20

**photograph [3]**
67/11 68/15 69/15

**photographs [1]**
84/4

**pick [1]**  17/11

**pickup [2]**  33/25
34/2

**picture [3]**  68/21
68/23 69/13

**PIERCE [14]**  1/2
1/5 1/15 1/18 1/24
22/23 23/22 28/5
53/20 54/14 57/18
57/19 68/16 86/20

**pills [3]**  8/19 8/25
9/2

**place [8]**  25/6
28/12 28/13 29/3
39/4 58/17 84/4
85/6

**plain [3]**  8/14
13/24 14/4

**Plaintiff [1]**  1/5
41/1 67/19

**planning [1]**  4/2

**plastic [2]**  51/15
65/4

**play [2]**  20/15
29/25

**playback [1]**
20/17

**played [22]**  20/13
21/14 22/14 22/25
24/1 24/10 25/15
25/22 26/9 27/16
27/25 30/1 30/9
30/22 31/10 32/8
32/24 33/9 34/25
41/5 41/12 56/19

**pleading [1]**
77/18

**pocket [2]**  8/20
13/24

**point [24]**  24/3
24/19 25/17 28/8
31/12 31/16 31/17
33/16 36/1 37/6
37/9 39/18 41/14
41/15 44/4 55/1
56/15 59/8 66/22
78/3 78/5 79/11
83/9 84/20

**points [2]**  39/1

**P**

points... [1]  77/19
poisonous [1]
79/21
police [14]  18/23
19/1 19/4 19/8
19/18 31/16 32/3
32/5 36/23 43/16
69/12 70/15 80/18
81/1
PORTER [2]  1/13
3/9
positioned [6]
24/6 24/7 38/20
69/23 70/10 80/23
positioning [2]
31/15 36/25
positive [8]  11/12
11/21 14/1 14/7
14/10 53/10 63/7
65/6
possession [15]
7/23 7/24 42/12
42/13 46/5 46/14
46/16 47/7 47/15
48/5 48/5 49/17
49/19 51/5 77/24
potential [1]
84/17
potentially [8]
10/12 16/22 37/22
38/10 81/9 81/23
82/12 85/15
powder [6]  11/19
51/16 51/17 65/5
65/5 65/16
powdery [1]
13/25
Prednisone [2]
51/14 65/3
preparation [1]
60/17
prepared [2]  60/2
60/14
prescription [4]
7/23 9/10 51/14
65/2
prescription-only
[1]  9/10
presence [2]
11/16 66/7
present [4]  3/13

4/5 14/16 77/9
preserved [1]
19/5
pretrial [1]  15/23
probable [15]
7/22 10/1 14/3
32/19 57/2 57/8
57/13 57/16 57/20
57/22 66/11 66/12
67/22 78/22 79/3
probation [7]
15/20 15/23 16/20
16/21 25/1 25/11
53/7
problem [2]  45/20
81/5
proceed [3]  3/24
44/16 63/23
proceedings [5]
44/15 59/24 61/23
86/12 86/15
products [1]
21/24
proffer [1]  3/20
proper [1]  57/5
prostitution [1]
28/17
proximity [1]
56/12
public [2]  1/17
14/20
publish [3]  20/6
20/19 41/3
pull [1]  13/9
pulled [5]  21/20
36/6 42/8 42/14
65/20
pulling [1]  30/4
purchase [1]
76/20
purposefully [1]
81/16
purposes [4]  4/3
38/9 81/2 81/2
pursuant [3]  9/3
15/5 53/6
push [1]  21/5
pushing [1]  21/7

**Q**

question [17]
10/4 10/7 10/9
23/1 23/9 45/11

50/15 51/4 70/12
71/12 72/8 73/22
73/22 76/4 84/6
85/25 86/3
questioning [3]
7/5 9/18 15/9
questions [4]
20/16 37/5 62/2
76/12
queued [1]  4/13
quicker [1]  75/18

**R**

R-I-D-L-E [2]  4/12
5/8
radar [1]  17/14
radio [18]  17/3
18/23 19/1 19/2
19/4 19/8 19/18
21/2 21/3 21/10
23/3 23/12 26/11
26/15 31/12 56/19
83/25 84/3
radioed [1]  18/7
rate [1]  11/2
rates [1]  29/2
re [2]  26/3 65/7
re-approach [1]
65/7
re-entered [1]
26/3
reaction [1]  75/19
ready [1]  25/8
reality [1]  51/24
realized [1]  63/22
realtime [1]  33/7
recently [1]  17/10
recess [2]  61/23
86/11
recognize [4]
19/15 40/6 40/8
67/14
recollection [3]
42/12 47/18 63/14
record [7]  3/21
21/7 21/18 48/20
83/9 84/12 85/7
recorded [2]  21/6
40/10
recording [26]
4/14 19/8 20/13
20/18 20/23 21/4
21/14 22/14 22/25

24/1 24/10 25/15
25/22 26/9 27/16
27/25 30/1 30/9
30/22 31/10 32/8
32/24 33/9 34/25
41/5 41/12
records [1]  21/5
recovered [1]
79/20
Recross [2]  2/6
76/14
Recross-Examina
tion [2]  2/6 76/14
redirect [3]  2/5
62/4 62/6
reference [1]  12/4
referenced [4]
8/2 48/2 63/1
65/11
references [3]
63/19 63/20 85/21
referencing [2]
63/25 83/24
refresh [2]  48/11
63/13
refreshed [1]
49/11
relation [1]  61/4
relationship [2]
15/22 15/25
relevance [2]
6/18 10/14
rely [1]  77/17
remarking [1]
33/12
remedy [1]  85/11
remove [1]  3/16
rephrase [3]
71/12 71/24 72/8
report [20]  8/9
8/10 14/23 24/24
47/16 47/24 48/9
51/8 60/2 60/14
61/9 62/13 62/24
63/14 63/19 64/12
64/16 64/20 64/22
79/13
Reporter [2]  1/22
86/18
reports [4]  60/16
60/25 78/4 79/13
required [1]
82/23

requirement [1]
81/4
resetting [2]
83/15 83/23
residence [6]
12/25 16/3 54/20
57/19 58/10 74/21
residue [2]  51/13
65/2
resisting [15]
46/18 46/22 46/24
47/1 47/21 49/2
49/14 49/15 51/20
62/18 62/22 63/16
77/24 77/25 82/8
resource [1]
29/15
response [4]  7/8
10/5 78/23 86/6
restate [1]  70/12
restroom [1]
61/18
result [4]  10/10
11/11 12/10 13/15
Resumed [1]
61/24
retest [1]  72/24
return [1]  20/11
revealed [1]  14/4
review [2]  19/7
60/16
Rhode [4]  34/20
39/6 58/17 69/6
RIDLE [16]  2/2
4/9 4/25 5/4 5/5
5/8 44/20 44/24
45/14 45/16 45/21
47/24 48/21 62/8
67/9 78/4
Ridle's [1]  79/13
right-hand [1]
80/12
risk [1]  39/19
River [2]  28/12
28/13
RMR [2]  1/22
86/18
road [13]  13/9
28/13 31/17 34/20
37/10 39/5 44/5
67/17 68/20 68/21
69/22 80/18 82/12
roads [1]  68/11

Page 95

UNITED STATES versus KWIJAN MONTRELL BAKER
Case 2:22-cr-14012-AMC   Document 30   Entered on FLSD Docket 05/24/2022   Page 95 of 97

**R**

roadway [1]  64/8
rock [4]  8/23 8/24
9/1 14/6
rocks [1]  11/18
rolled [2]  41/18
44/8
rule [2]  4/22 4/24
rush [1]  37/17

**S**

S-H-I-V-E-L-Y [1]
82/16
safe [2]  67/2 81/8
safety [1]  81/2
sales [3]  28/16
72/14 74/12
sat [1]  35/7
school [1]  29/14
search [3]  9/3
14/3 64/23
seat [1]  34/12
second [8]  1/17
13/2 21/16 23/22
32/10 45/7 64/22
82/18
secondary [3]
12/11 26/16 26/17
seconds [2]  41/3
75/14
section [5]  5/18
11/7 18/11 23/17
44/5
security [1]  39/19
sees [3]  26/24
84/21 84/23
seized [1]  84/20
seizure [1]  85/3
selling [2]  16/2
16/15
sequence [1]
52/6
service [1]  29/6
services [1]  15/24
shall [1]  82/25
shared [1]  4/16
SHERIFF [1]  2/2
Sheriff's [8]  4/1
4/10 5/4 5/13 5/17
7/3 60/22 63/3
shifter [1]  8/24
shifting [1]  39/19
Shively [2]  82/16

83/4
shop [6]  21/20
21/23 22/4 22/11
53/15 57/15
shops [1]  21/24
shorter [1]  20/24
shot [1]  75/25
shutting [1]  66/2
sic [2]  45/14 71/7
side [14]  8/24
26/14 26/25 27/5
31/7 31/8 52/4
52/10 52/11 68/20
70/21 70/22 86/2
86/8
sign [1]  11/4
signify [1]  70/2
signs [2]  17/22
66/2
Silverado [5]  6/9
6/12 33/24 34/18
34/21
simple [1]  42/4
single [10]  38/17
38/18 39/11 39/13
57/23 61/7 61/10
78/12 78/22 79/17
singular [1]  80/17
sirens [1]  59/1
situation [1]
16/11
slightly [2]  41/19
70/5
slowed [1]  66/1
small [4]  8/24 9/1
13/24 14/6
smoking [1]
75/16
So.3d [1]  82/18
sobriety [1]  50/5
soon [1]  30/12
sounds [1]  64/10
south [7]  1/14
1/23 24/8 55/2
67/18 69/21 86/19
southbound [8]
30/17 31/18 39/5
63/21 66/19 68/22
68/24 68/25
SOUTHERN [1]
1/1
space [1]  26/1
spacing [1]  66/5

Special [5]  3/8
5/18 11/6 18/11
29/10
specialty [1]  6/12
specific [2]  10/3
80/22
speculate [1]
38/12
speculation [3]
71/11 72/6 73/20
speech [1]  66/1
speed [2]  11/2
52/16
spell [5]  4/11 5/7
12/5 27/22 60/9
spitting [1]  26/22
splattering [1]
27/7
spoke [1]  25/11
spoon [3]  8/14
51/13 65/1
spoons [1]  9/6
9/8 14/14
spot [3]  26/7
26/16 26/17
spots [1]  26/19
squeeze [2]  63/4
63/10
St [7]  4/1 4/9 5/4
5/13 5/16 6/15
6/23
stand [1]  50/18
starting [2]  75/10
77/16
state [8]  3/22 5/6
12/11 23/23 53/19
72/20 82/15 82/16
statements [1]
27/4
STATES [8]  1/1
1/4 1/10 1/23 3/7
5/3 78/24 86/19
station [1]  13/10
statute [7]  46/1
46/23 47/3 78/21
79/7 79/19 83/11
statutes [1]  36/15
stay [1]  26/2
stayed [1]  22/10
staying [1]  81/16
steering [1]  35/15
step [3]  8/13
13/23 69/16

stick [1]  6/13
stopped [13]  7/11
10/10 11/14 40/17
42/20 44/2 52/4
58/8 58/14 62/12
71/25 72/10 79/16
street [40]  1/17
11/2 11/3 11/13
14/20 22/22 23/22
28/5 28/23 28/24
29/4 29/5 30/14
30/16 30/17 30/18
31/17 37/11 38/22
39/5 54/11 54/12
54/13 55/2 55/14
56/3 58/5 58/8
58/14 63/21 66/16
66/20 67/18 68/16
68/22 68/23 69/6
71/23 74/6 79/16
streets [1]  22/16
stretch [1]  39/7
strong [1]  81/21
struck [2]  78/16
79/3
submit [4]  7/6
78/19 79/14 79/18
submitted [1]
3/20
submitting [1]
85/4
subsequent [3]
9/11 14/3 17/21
substance [7]
7/23 8/23 13/25
48/5 49/19 61/20
76/21
substances [2]
11/10 53/10
substantial [2]
21/11 80/13
sufficient [1]
10/14
summarize [1]
53/9
Sunrise [1]  11/6
supplemental [2]
60/2 82/25
suppress [5]  1/9
3/19 6/19 79/25
85/10
suppressed [1]
79/21

suppression [1]
85/11
surrounded [1]
39/16
surrounding [2]
66/24 78/14
surveillance [18]
10/25 17/4 18/5
18/12 20/21 22/8
22/19 23/10 37/6
37/20 53/4 56/22
57/11 76/5 80/23
80/24 81/2 81/11
surveilling [1]
25/2
suspected [1]
50/24
suspicion [1]
85/1
sustain [1]  72/7
Sustained [1]
71/12
SUV [1]  6/8
swerved [2]
78/15 79/2
swerving [5]
34/18 38/19 43/13
78/18 83/8
SWORN [1]  5/5
system [3]  65/14
75/19 75/21

**T**

T-O-M-A-S-Z-E-W-
S-K-I [2]  12/7
60/11
table [2]  3/7
20/11
tag [1]  6/12
tailgating [1]  67/2
tampering [1]
46/11
targets [1]  73/2
taught [1]  61/3
ten feet [1]  44/6
ten-minute [1]
61/17
tender [1]  43/2
terms [3]  52/6
74/6 74/7
test [22]  4/15
16/1 16/7 16/8
17/10 50/8 50/16

**T**

test... [15]  50/18
50/20 65/14 65/15
72/18 72/21 72/24
73/3 73/7 73/8
73/8 74/14 74/15
74/16 74/17
tested [13]  11/12
11/20 11/21 13/25
14/7 14/10 15/5
15/9 15/19 15/22
53/10 63/7 65/6
testimony [7]
10/2 61/21 77/20
78/13 80/6 84/19
85/21
texting [5]  35/19
35/20 55/17 55/20
58/5
thank [28]  3/2
29/20 44/9 44/14
48/18 49/8 49/9
51/11 51/19 52/19
53/1 59/23 60/12
61/19 62/3 68/7
69/2 76/10 77/1
77/2 77/3 77/4
79/22 79/23 84/8
85/18 86/9 86/10
thinking [2]  38/13
70/17
threw [1]  11/14
throw [1]  38/4
throwing [1]
53/24
thumb [2]  35/21
84/1
thus [1]  79/3
ticket [2]  43/12
43/13
tied [1]  85/21
tight [1]  36/24
time [63]  5/3 7/3
7/16 17/12 18/14
19/21 20/21 20/24
21/11 22/3 22/5
22/17 24/6 24/24
25/2 25/12 27/6
27/11 28/18 36/11
37/5 37/10 37/16
38/7 39/14 40/19
42/4 42/21 43/17

51/9 53/17 53/22
54/2 54/5 54/8
54/17 54/24 57/5
57/13 57/16 57/20
57/22 63/5 64/7
67/25 69/20 69/23
70/7 71/19 72/11
72/16 72/23 73/1
73/7 73/9 74/22
75/14 75/21 75/25
76/5 78/11 83/3
84/20
times [7]  17/21
21/1 34/19 36/9
36/10 78/15 78/16
timing [1]  76/4
tint [19]  33/13
33/15 33/16 34/1
34/8 34/10 36/5
36/7 36/13 36/16
36/16 39/25 41/17
41/20 41/22 55/4
58/3 61/13 79/11
tobacco [2]  21/24
21/25
today's [2]  77/19
82/25
Tomaszewski [34]
7/1 10/24 11/23
11/25 14/16 16/16
16/20 16/24 17/3
17/7 18/4 21/19
22/3 22/16 23/5
24/23 25/10 26/12
26/21 26/24 27/21
30/3 30/25 31/1
31/6 31/23 33/11
33/14 36/6 60/6
60/7 60/8 63/15
63/20
Tomaszewski's
[1]  27/4
torch [1]  63/6
total [6]  4/4 4/7
20/18 29/16 51/17
76/5
totality [8]  7/10
10/15 15/13 20/20
37/18 42/3 73/15
79/15
towards [5]  22/6
23/13 30/14 33/5
53/19

traffic [54]  5/25
6/1 9/19 11/5 11/7
11/11 13/10 14/25
30/19 33/21 35/4
37/6 37/14 37/17
39/15 40/11 41/10
51/2 53/17 53/22
54/5 54/8 54/17
54/24 56/19 58/16
58/21 58/23 63/1
63/4 63/8 63/22
64/2 64/8 66/12
66/14 66/14 66/21
67/22 69/5 70/8
76/6 78/8 78/8
78/20 79/4 81/5
82/3 83/1 84/21
84/23 84/23 85/14
85/14
transcript [5]  1/9
82/24 83/3 84/3
85/20
transcription [1]
86/15
transmission [1]
83/25
transmissions [1]
84/3
travel [5]  28/3
30/15 34/21 68/25
80/15
traveled [5]  28/14
54/10 57/18 72/16
73/12
traveling [8]
33/23 34/5 53/13
55/1 55/14 68/23
68/24 81/8
travels [1]  28/4
tree [1]  79/21
trial [2]  83/15
83/23
tries [1]  80/1
tube [1]  14/9
turning [2]  37/12
52/16
Twenty [1]  54/13
Twenty-ninth [1]
54/13
two feet [1]  34/22
two miles [1]
30/20
two-lane [1]

31/17
typical [1]  6/9
typically [3]  21/24
72/23 75/9

**U**

U.S [5]  1/14 1/14
1/17 3/9 86/19
ultimately [17]
7/11 8/8 11/25
12/17 13/12 14/25
15/3 23/14 26/23
28/14 28/18 29/23
30/4 41/24 41/25
65/21 69/4
unable [3]  11/8
17/23 52/4
uncommon [2]
74/17 74/19
uncooperative [1]
50/10
Understandably
[1]  80/16
understanding [3]
9/22 47/21 75/4
unfit [2]  80/5
80/10
unidentified [3]
8/19 8/25 9/1
unit [8]  5/16 5/21
12/14 12/23 15/25
17/8 18/11 19/1
UNITED [7]  1/1
1/4 1/10 3/7 5/3
78/24 86/19
Unites [1]  1/23
units [3]  11/4
44/4 63/5
unmarked [10]
18/13 18/19 32/5
38/21 43/19 52/2
52/3 52/16 63/5
63/22
unsure [1]  43/14
unwelcome [2]
7/20 8/1
upper [2]  75/9
75/17
us [22]  16/3 16/4
16/7 17/3 18/7
18/7 18/9 21/5
22/18 37/1 37/2
43/7 50/11 50/12

52/9 52/9 52/9
52/10 60/19 68/19
85/25 86/4
US1 [1]  37/17
USA [1]  3/3
user [1]  75/24

**V**

vaguely [1]  35/22
validity [1]  83/1
variety [1]  50/23
vehicle [156]  6/7
6/10 18/13 18/13
18/19 31/16 32/2
32/3 32/5 36/23
37/2 39/13 39/16
39/21 43/17 44/7
52/5 56/2 56/8
59/17 63/3 63/11
66/18 66/23 69/12
69/12 69/22 70/3
70/7 78/14 78/14
78/16 78/17 80/19
81/1
versus [3]  3/4
35/20 82/16
via [1]  17/3
Vice [2]  5/18 5/21
video [8]  4/14
40/10 41/5 41/9
41/12 41/14 41/14
41/15
violated [1]  25/1
violation [10]
51/3 62/17 78/8
78/20 78/21 79/4
79/7 79/19 80/3
85/14
violations [4]
7/10 8/6 36/7
85/14
violence [16]
28/16 46/18 46/22
46/24 47/1 49/2
49/15 51/21 62/18
62/22 63/17 72/14
72/15 77/25 78/1
82/9
Virginia [6]  11/5
58/9 58/12 58/14
58/16 58/18
visual [1]  52/22

Page 97

UNITED STATES versus KWJAN MONTRELL BAKER
Case 2:22-cr-14012-AMC   Document 30   Entered on FLSD Docket 05/24/2022   Page 97 of 97

**V**

**visualize [1]** 84/4
**visually [2]** 38/19
38/24
**voices [4]** 23/1
23/2 27/18 27/18
**voltage [1]** 64/24
**vomit [1]** 27/7
**vomiting [3]**
26/14 26/24 42/21
**vs [1]** 1/5

**W**

**walk [3]** 25/18
50/8 50/15
**walk-and [1]**
50/15
**walking [1]** 24/22
**warning [1]** 43/14
**warrant [9]** 12/12
12/15 12/15 12/18
12/21 12/22 12/24
13/13 13/16
**warrants [1]** 83/7
**watched [1]** 38/3
**watching [1]**
35/11
**weaving [3]** 10/10
80/11 80/14
**weight [1]** 51/17
**welcome [1]**
48/19
**west [2]** 13/9
54/10
**westbound [2]**
28/4 68/21
**wheel [1]** 38/2
**Whenever [1]**
32/12
**white [12]** 6/8
10/25 11/18 13/25
14/6 28/12 28/13
51/13 51/17 65/1
65/5 74/12
**window [9]** 26/22
26/23 36/20 41/11
41/17 41/18 41/22
44/8 58/3
**windows [1]** 34/2
**windshield [3]**
34/8 34/10 58/6
**wish [2]** 3/24
52/23

**wishes [1]** 3/16
**witnesses [4]** 2/1
4/3 4/5 77/6

**Y**

**yellow [1]** 69/19