**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**CASE NO. 22-14012-CR-CANNON**

**UNITED STATES OF AMERICA**,

    Plaintiff,
v.

**KWUAN MONTRELL BAKER**,

    Defendant.
_____/

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF No. 20]**

**THIS CAUSE** comes before the Court upon Defendant's Motion to Suppress Unlawfully Obtained Evidence and Request for Evidentiary Hearing [ECF No. 20], filed on April 25, 2022. The Government opposes the Motion [ECF No. 22]. The Court has reviewed the Motion and the Government's Response. The Court also held an evidentiary hearing on the Motion on May 20, 2022 [ECF No. 27], after which the Court ordered supplemental briefing on the validity of the subject traffic stop [ECF No. 27]. The parties then filed supplemental briefs [ECF Nos. 33–34], which the Court has reviewed, along with the full evidentiary record pertinent to the Motion. Following review, Defendant's Motion [ECF No. 20] is **DENIED**.

**PARTIES' ARGUMENTS AND SUMMARY OF RULING**

Defendant is charged in a three-count indictment with possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count 1); possession with intent to distribute a detectable amount of fentanyl, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Count 2); and possession of a firearm in furtherance of the drug trafficking crime alleged in Count 2, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 3) [ECF No. 1].

1

In the Motion to Suppress, Defendant seeks to suppress "any and all evidence illegally seized, both physical and testimonial, and the fruits thereof, following a traffic stop conducted in violation of the Fourth Amendment on April 6, 2021" [ECF No. 20 p. 1]. The physical evidence includes (1) a .22 caliber pistol and ammunition as charged in Count 1 (found on the left side waistband of Defendant's pants following the traffic stop) and (2) approximately 1.9 grams of fentanyl and $1,314 in cash, also found on Defendant's person following a patdown [ECF No. 20 p. 2]. In support of the Motion, and as argued in a Supplemental Brief [ECF No. 34], Defendant contends that the traffic stop of the vehicle in which he was a passenger violated the Fourth Amendment because it was not supported by reasonable suspicion or probable cause of any traffic violation or criminal activity [ECF Nos. 20, 34]. More specifically, Defendant argues that the officers lacked an objective basis for the stop because the reason given for the stop during the pretrial detention hearing and in the Government's initial opposition to the Motion—that the driver of the vehicle (an uncharged individual by the name of Kane) violated Fla. Stat. § 316.089(1) by failing to maintain a single lane—lacks evidentiary support in light of Florida case law applying that statute [ECF No. 20 pp. 4–5; ECF No. 34 pp. 9–13; ECF No. 39 p. 79].

During the hearing, and in its Supplemental Brief, the government preserves its initial view that probable cause existed to support the stop based on the driver's failure to maintain a single lane, *see* Fla. Stat. § 316.089(1) [ECF No. 33 p. 1 n.1 (incorporating arguments raised in ECF No. 22)]. But the government offers various additional reasons to deny the Motion rooted in the evidence presented during the suppression hearing [ECF No. 33; *see* ECF No. 30 pp. 80–81, 84–85]. As the government urges, (1) law enforcement had reasonable suspicion to stop the driver (Kane) for driving under the influence, in violation of Fla. Stat. § 316.193(1)(a); (2) law enforcement had probable cause to stop the driver for violating Florida's window tint law, *see* Fla.

Stat. § 316.2953; (3) law enforcement had probable cause to stop the driver for texting while driving, in violation of Fla. Stat. § 316.305(3)(a); and (4) even if law enforcement ultimately lacked a lawful basis to stop the car, any such failure amounts at most to a reasonable mistake not warranting the exclusionary rule, which is generally reserved for deliberate, reckless, or grossly negligent disregard for the Fourth Amendment, *see Davis v. United States*, 564 U.S. 229, 238 (2011) [ECF No. 33; ECF No. 30 p. 85]. The government also contends that Defendant was not seized within the meaning of the Fourth Amendment until the driver of the car tried to speed away from police cars in an attempt to flee, at which point law enforcement had reasonable suspicion to detain the vehicle for attempted fleeing or eluding a law enforcement officer, in violation of Fla. Stat. § 316.1935(1) [ECF No. 33 pp. 13–14; ECF No. 30 pp. 84–85].

Upon a full review of the evidentiary record and the cited authorities, the Court concludes that suppression is not warranted. The Court accepts and agrees with Defendant that the evidence does not support a traffic stop based on a violation of Fla. Stat. § 316.089(1). But that is not the end of the inquiry under the Fourth Amendment. An officer's subjective reason for making a stop need not be the criminal activity for which the objective facts furnish reasonable suspicion or probable cause. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("'[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'" (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)); *Lee v. Ferraro*, 284 F.3d 1188, 1196 (11th Cir. 2002) ("'[W]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest.'" (citing *United States v. Saunders*, 476

F.2d 5, 7 (5th Cir. 1973)); *see also United States v. Lopez-Moreno*, 420 F.3d 420, 431–32 (5th Cir. 2005) (citing *Whren*, *Devenpeck*, *Scott v. United States*, 436 U.S. 128, 138 (1978), and *Goodwin v. Johnson*, 132 F.3d 162, 173 (1997), and rejecting argument that traffic violation could not support reasonable suspicion for stop because it was "post hoc rationalization"); *see also* 1 Wayne R. Lafave, Search & Seizure § 1.4(d) pp. 169–74 (6th ed. 2020). In this case, based on the credible testimony of Deputy Evan Ridle and the supporting exhibits, and regardless of the initial subjective reason for conducting the stop, officers had reasonable suspicion to stop the driver of the vehicle for driving under the influence and for attempted fleeing and eluding, and to a lesser extent (although sufficiently present), illegal tints.[1] Alternatively, the Court agrees with the government as to the officers' good faith; the evidence shows that law enforcement acted with an objectively reasonable, good-faith belief that their conduct in stopping the car was lawful, rendering inapplicable the sanction of exclusion.

## FACTUAL FINDINGS

St. Lucie County Sheriff's Office (SLCSO) Deputy Evan Ridle testified as the sole witness during the evidentiary hearing [ECF No. 30 (transcript)]. The Court found Deputy Ridle's testimony to be credible. The government also introduced three exhibits into evidence [ECF No. 28 (GX1 through GX3)]: an audio recording of the police radio traffic from the April 6, 2021 traffic stop [ECF No. 28-1 (GX1); ECF No. 30 pp. 19–20], a video recording from Defendant's cell phone taken during the stop [ECF No. 28-2 (GX2); ECF No. 30 p. 40], and a sample photograph of the intersection of Okeechobee Road and South 25th Street in Fort Pierce, Florida [ECF No. 28-3 (GX3); ECF No. 30 pp. 67–68]. The following represents the Court's

---

[1] The Court does not reach the Government's separate argument with respect to Deputy Ridle's assumption that Kane was texting while driving, in violation of Fla. Stat. § 316.305(3)(a) [ECF No. 33 p. 13; ECF No. 30 p. 56].

factual findings based on the evidence presented.

\*\*\*

1. On April 6, 2021, Deputy Ridle and various other members of SIS were conducting surveillance on an individual named Jordan Kane.

2. As of that day, Deputy Ridle had worked for the SLCSO for approximately four years, the last year and a half as a member of the Special Investigations Section (SIS) [ECF No. 30 p. 29; *see* ECF No. 30 p. 5]. The SIS investigates narcotics and other "vice"-related crimes and has approximately eight total members [ECF No. 30 p. 5].

3. Kane was driving a Silver Chevy Silverado pick-up truck with a passenger later determined, upon execution of the traffic stop, to be Defendant [ECF No. 30 pp. 6, 33].

4. Deputy Ridle and other members of the SIS Division (including Deputies Tomaszewski and Osteen) previously had arrested Kane for drug-related offenses in St. Lucie County; specifically, on January 20, 2021, when Kane was arrested for possession of narcotics and narcotics paraphernalia in his vehicle; then on January 22, 2021, during which Kane attempted to flee in his vehicle from law enforcement but was "boxed in"; and then on February 2, 2021, during which law enforcement arrested Kane pursuant to an arrest warrant and found drugs and drug paraphernalia in his car [ECF No. 30 pp. 7–14, 62–63].

5. On both the January 20 and 22, 2021 arrests, Deputy Ridle personally observed Kane to be under the influence of narcotics [ECF No. 30 p. 17].

6. As a result of Kane's drug-related arrests, and as reported by Kane's probation/pre-trial services officer, Kane was required to get drug tested [ECF No. 30 p. 15]. Kane's probation officer relayed to SLCSO officers (including Deputies Ridle and Tomaszewski) that Kane had been scheduled to take a drug test on April 5, 2021, but had failed to show

up for the test, and that she believed someone with whom Kane was living was selling narcotics [ECF No. 30 pp. 15–16].

7. On April 6, 2021, the day of the traffic stop, around 4:00 or 4:30 p.m., Deputy Tomaszewski alerted Deputy Ridle and other members of the SIS that he had begun surveillance on Kane's vehicle [ECF No. 30 p. 17]. Approximately five members of SIS joined in the surveillance (including Deputies Tomaszewski, Osteen, and Ridle, and Detective Mondragon), all driving unmarked vehicles and attempting to set up a perimeter from various angles to see where Kane was going and what he was doing [ECF No. 30 pp. 18, 23, 27; ECF No. 28-1 (police radio transmissions roughly 45 minutes in actual duration as explained)].

8. Kane was on the radar of SLCSO as a result of his various drug-related arrests and pattern of possessing narcotics in his car [ECF No. 30 p. 17 ("[K]nowing that Jordan Kane frequently uses narcotics, knowing that he had recently failed a drug test, we believed that he would be either going to pick up narcotics or doing—doing—every time we have dealt with him, he has had narcotics in his vehicle, so he is somebody that is on our radar.")].

9. Kane's first stop as reported during the surveillance was a "smoke shop," described by Deputy Ridle as a place that sells tobacco products and also detox-related products to help pass drug tests [ECF No. 30 pp. 21–22]. Kane remained in the smoke shop for about five minutes [ECF No. 30 p. 22].

10. After the smoke shop, Kane drove and parked his car in a parking lot near the state courthouse, inside of which is a state drug-testing facility [ECF No. 30 pp. 23–25]. Kane's probation officer had reported to SIS deputies that Kane was required to report for a drug test no later than April 6, 2021 (that day), or else have his probation revoked [ECF No. 30

    pp. 24–25]. Kane remained in the courthouse for a few minutes, after which deputies saw Kane exit the courthouse and re-enter his vehicle [ECF No. 30 pp. 25–26]. Kane stayed in his car for about five to ten minutes and then moved parking spots within the same parking lot [ECF No. 30 p. 26].

11. During the time in which Kane was parked, Deputy Tomaszewski saw Kane, still operating his car, leaning out of the car and vomiting [ECF No. 30 pp. 26–27, 53–54].

12. Kane stayed in the parking lot for another five minutes or so and then started driving west on Orange Avenue toward an area of Fort Pierce known for gun violence, drug sales, prostitution, and gang members [ECF No. 30 pp. 28–29].

13. Kane eventually parked in the driveway of a residence on Avenue E and stayed in the driveway for approximately five minutes or less [ECF No. 30 p. 30].

14. Kane then left the Avenue E address driveway and continued driving, still under surveillance, as he proceeded south on 25th Street (a busy road) for about 1.5 to 2 miles until four to five unmarked police cars managed essentially to encircle Kane with their cars on the road [ECF No. 30 pp. 30–32, 37, 39, 43, 64].

15. Deputy Ridle believed Kane was under the influence of drugs, although he did not personally see him buy or ingest narcotics [ECF No. 30 pp. 37–38 ("[Based on all of my previous interactions with Mr. Kane, he has been intoxicated while he has been behind the wheel, he has been nodding off and things like that. We watched him throw up while he was in the parking lot next to the courthouse, and it is common when people use opioids— I know this based on my training experience—that it has a delayed effect. So it might not initially hit you, but as time goes on, then you start to really feel the effects of the narcotic."); ECF No. 30 pp. 72–73 (explaining that, in his experience, it is common for

individuals required to take regular drug testing to consume drugs after a drug test knowing that they won't have to take another drug test right away); ECF No. 30 pp. 73–74 (testifying that Kane, having just completed a drug test after failing one a few days before, was believed to be purchasing drugs at the residence on Avenue E, in an area commonly known for drug sales); ECF No. 30 p. 76].

16. During this time, Deputy Ridle saw Kane failing to maintain his lane and going towards the center line and crossing over it [ECF No. 30 pp. 33–34 (testifying that "Silverado was leaving its lane of travel and going over into the right lane by approximately one to two feet before correcting and coming back into its lane"); ECF No. 30 p. 38 ("I believe that he had used narcotics and that the narcotics were taking effect and that is why he was failing to maintain his single lane.")].  Deputy Ridle did not, however, perceive Kane's crossing of the center lines as materializing into a palpable safety concern because officers were essentially boxing him in with their vehicles, preventing civilians from getting close to Kane's car [ECF No. 30 p. 39].  Nor did Kane's vehicle strike another car or cause other vehicles to move out of the way [ECF No. 30 p. 56].

17. Deputy Ridle also testified that Kane's window tints were so dark, leading him to believe they were illegal based on his experience conducting other stops. Deputy Ridle could not tell at that point that there was a passenger in the car.  Deputy Tomaszewski also noted that Kane's tints were too dark to see inside the car [ECF No. 30 pp. 33, 36, 41; ECF No. 28-1 (GX1) (referencing dark tints)].

18. Consistent with Deputy Ridle's testimony, the video admitted as Government Exhibit 2 [ECF No. 28-2] is taken from Defendant's cell phone and shows, in a very quick single frame approximately ten seconds into the video, what appear to be dark tints on the bank

passenger window.

19. In addition to the tints, Deputy Ridle saw, through the un-tinted front windshield, what appeared to be Kane holding a cell phone in his hand while making a texting motion with his finger [ECF No. 30 pp. 35, 58].

20. Moments later, the SIS officers activated their lights to initiate a traffic stop, at which point Kane sped up in an attempt to flee and go around the unmarked car in front of him.  A SIS officer managed to "box him in," however, preventing any escape (similar to what happened on January 22, 2021) [ECF No. 30 pp. 44, 63, 71; ECF No. 30 p. 52 ("He drove forward to try to turn to the left to go around the stop unmarked patrol vehicle that was in front of him; however, another unmarked patrol vehicle came from the side and stopped his vehicle where he was unable to continue without crashing into one of our vehicles.")].

21. About a half-mile down the road, roughly 45 minutes after the initial start of surveillance on Kane, officers conducted the traffic stop [ECF No. 30 pp. 69, 76].

22. Defendant was sitting in the passenger seat and denied having any weapons on him [ECF No. 28-2].  Deputies then ordered him out of the vehicle and patted him down, upon which they discovered a firearm in his pants area [ECF No. 28-2 (video of portion of stop)]. Defendant was a convicted felon at the time of the traffic stop.

23. Kane was arrested that day on felony drug charges.  He appeared to be under the influence of opioids [ECF No. 30 pp. 46, 65–66].  SIS deputies did not issue Kane a citation for illegal tints or for attempted fleeing or eluding, and they did not conduct a DUI investigation on scene.  As Deputy Ridle explained, Kane was being arrested for more serious felony drug charges; deputies did not deem it necessary to pursue lesser misdemeanor offenses under the circumstances; and Kane had a history of not assisting

law enforcement during stops [ECF No. 30 pp. 41–42, 47–50]. Kane was charged with misdemeanor resisting without violence, which Deputy Ridle explained addressed Kane's attempt to flee as described [ECF No. 30 p. 49].

## CONCLUSIONS OF LAW

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. Evidence obtained in deliberate or reckless violation of the Fourth Amendment must be suppressed. *Davis v. United States*, 564 U.S. 229, 240 (2011). "Not all interactions between law enforcement and citizens, however, implicate the scrutiny of the Fourth Amendment." *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011). "'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a 'seizure' has occurred.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). The focus remains on whether a person's freedom of movement was restrained by the application of physical force or by submission to a show of authority. *See California v. Hodari D.*, 499 U.S. 621, 6262 (1991). And "[w]hen a suspect flees from the police, he is not submitting to their authority and therefore is not seized" within the meaning of the Fourth Amendment. *Jordan*, 635 F.3d at 1186; *see also Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97, (1989). Put another way, "an attempted seizure, without actual submission, is not a seizure for Fourth Amendment purposes." *United States v. Dolomon*, 569 F. App'x 889, 892 (11th Cir. 2014) (citing *Hodari D.*, 499 U.S. at 626 n.2).

The Fourth Amendment "seizure" is triggered at the point a suspect submits to a show of law enforcement authority or is physically restrained, and it is commonly understood that a "[a] traffic stop is a seizure within the meaning of the Fourth Amendment." *United States v. Purcell*,

236 F.3d 1274, 1277 (11th Cir. 2001). A decision to stop a car is reasonable where the police have probable cause to believe that a traffic violation occurred, or where there is reasonable suspicion that criminal activity is foot. *Whren*, 517 U.S. at 810; *United States v. House*, 684 F.3d 1173, 1199 (11th Cir. 2012); *United States v. Hawkins*, 934 F.3d 1251, 1259 (11th Cir. 2019); *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008). "Probable cause requires that the facts and circumstances within an officer's knowledge and of which the officer has reasonably trustworthy information be sufficient to warrant a prudent man in believing that the person seized is guilty of a crime." House, 684 F.3d at 1199 (internal quotation marks and brackets omitted). Probable cause deals with probabilities—not legal technicalities—and it requires a practical assessment of the totality of circumstances. *Illinois v. Gates*, 462 U.S. 213, 231 (1983). "[R]easonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," but it still "requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (quotations omitted); *Terry*, 392 U.S. at 19–20 (permitting law enforcement to seize a suspect for a brief investigative stop where officers have reasonable suspicion that suspect was involved in, or is about to be involved in, criminal activity, and stop is reasonably related in scope to circumstances that justified the stop in the first place). Finally, it is well-settled that an officer's motive in making the stop does not invalidate what is otherwise "objectively justifiable behavior under the Fourth Amendment." *Whren*, 517 U.S. at 812; *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003) (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

Applying these principles here in light of the Court's factual findings, suppression is unwarranted.

As a preliminary matter, the Court agrees with Defendant, based on the authorities cited

[ECF No. 34 pp. 9–11; ECF No. 20 pp. 4–5], that SIS officers lacked reasonable suspicion to stop Kane's car for failing to maintain a single lane, in violation of Fla. Stat. § 316.089(1). There is insufficient evidence in the record to indicate that Kane's lane-crossing conduct—focusing on that—put other vehicles in danger. The Court acknowledges Deputy Ridle's testimony that such a concern likely would have materialized toward civilian vehicles had officers not been surrounding Kane's car on the roadway [ECF No. 30 p. 39]. The Court also acknowledges the related fact that Kane reasonably appeared to law enforcement to be driving under the influence for various reasons, as further discussed below. *Cf. Green v.* State, 831 So. 2d 1243, 1243 (Fla. Dist. Ct. App. 2002) (referencing absence of evidence of intoxication or impairment). But the Court ultimately concludes, as to the Fla. Stat. § 316.089(1) issue specifically, that the record is insufficient to support the stop on that basis. The authorities applying Fla. Stat. § 316.089(1) focus mostly on a materialized safety concern from the swerving itself (such as forcing other vehicles to brake suddenly to avoid a collision), *see State v. Wilson*, 268 So. 3d 927, 929 (Fla. Dist. Ct. App. 2019), and that degree of lane-swerving safety risk is not manifest here.

Nevertheless, the Court denies the Motion because SIS officers had reasonable suspicion to conduct the stop for driving under the influence; violating Florida's window-tint law; and attempted fleeing after they activated their lights and Kane sped up to get away through a gap in the cars. Under *Devenpeck v. Alford*, 543 U.S. 146 (2004), and the related cases cited above, *supra* pp. 3–4, it is well settled that an officer's subjective reason for making a stop need not be the criminal activity for which the objective facts furnish reasonable suspicion or probable cause. Thus, even assuming officers relied subjectively *only* on the crossing-lane issue—a proposition inconsistent with the evidentiary record adduced on the Motion—there still would be no Fourth Amendment problem with examining the objective validity of the action on other grounds. And

12

here, three such grounds exist that satisfy the reasonable suspicion threshold under the totality of circumstances. *See generally United States v. Arvizu*, 534 U.S. 266 (2002).

First, SIS officers had reasonable suspicion to believe that Kane was driving under the influence. Reasonable suspicion is not a high threshold, and it deals with probabilities, not certainties. There are ample probabilities in this record to support law enforcement's objectively reasonable belief that Kane was under the influence of a controlled substance—including, the following as drawn from the Findings of Fact above:

- SIS officers were surveilling Kane based on particularized experience and knowledge that Kane was a user of controlled substances and possessed drugs and drug-related paraphernalia in his vehicle;

- Kane's probation officer had provided specific information to SIS deputies that Kane had failed to show up for a mandatory drug test the day before the stop;

- on the day of the stop, deputies saw Kane go to a "smoke shop" at which drug-testing products are sold, go to the courthouse for some time right before close of business on the day he was required to test, then return to his car for some time while he then proceeded to throw up outside the window of his car;

- next he went directly to an address on Avenue E in an area known by law enforcement for high narcotics sales drugs;

- Deputy Ridle testified about his experience electing to consume drugs soon after a drug test [ECF No. 30 p. 73]; and

- Deputy Ridle further noted that Kane was crossing the center line of the lane while driving, which again was consistent with Deputy Ridle's testimony that opioids do not kick in right away.

Under these circumstances, notwithstanding Defendant's argument that officers did not stop Kane earlier in the 45-minute surveillance period or conduct DUI/field-sobriety tests on scene following Kane's arrest for felony drug offenses, the Court concludes that officers had objectively reasonable suspicion to support the traffic stop.

Second, officers had reasonable suspicion to believe that Kane was violating Florida's window-tint law. *See* Fla. Stat. § 316.2953. It is true that officers did not issue a citation for this following arrest, but that is not legally dispositive under the Fourth Amendment's objective inquiry. What the record does show, moreover, is that Deputy Ridle's testimony about the dark tints is supported by the freeze-frame image of the lower-back window of the vehicle as depicted in GX2, and another deputy also referenced the tint issue on the car in the record radio transmissions at GX1 [ECF Nos. 28-1, 28-2]. Thus, considering Deputy Ridle's credible testimony and the surrounding record, the Court is satisfied that reasonable suspicion also existed to stop the car based on the tint issue, even though the record on that point is not as robust as it is with respect to the driving-under-the-influence issue.

Third, the record also supports the government's additional submission that SIS deputies had reasonable suspicion to believe that Kane attempted to flee in his car, albeit briefly, after officers activated their lights on the roadway to effectuate the stop. *See* Fla. Stat. § 316.1935(1). Deputy Ridle testified on this point during the hearing, noting that Kane sped up to try to flee the unmarked cars through a gap in the vehicles but ultimately was unable to flee because deputies quickly boxed him in, preventing any escape. Deputy Ridle also noted that Kane had made a similar attempt during an earlier arrest on January 22, 2021, involving SLCSO SIS deputies as well. The Court finds this testimony to be credible and relies on its factual findings as drawn from Deputy Ridle's testimony. Florida law does not require a high-speed chase or other drawn-out form of fleeing to trigger the attempted eluding provision of Fla. Stat. § 316.1935(1). *Compare* Fla. Stat. § 316.1935(1), *with* Fla. Stat. § 316.1935(3); *see also Steil v. State*, 974 So. 2d 589, 590 (Fla. Dist. Ct. App. 2008). And although the attempt here was stopped quickly by virtue of the officers' actions in preventing the escape, there is sufficient evidence in the record to satisfy the

reasonable suspicion threshold.

Finally, to the extent there remain any questions as to the particular bases justifying the stop in this case, the Court has carefully considered the record and finds that any such possibility would not warrant application of the exclusionary rule, which is designed fundamentally to deter reckless or grossly negligent violations of the Fourth Amendment. *See Davis*, 564 U.S. at 240. SIS deputies conducted surveillance of Kane based on specific instances of Kane's drug-related offenses. They proceeded to observe a series of actions by Kane that, under the totality of the circumstances, warranted an objectively reasonable belief that the stop of the car was lawful. The record does not support flagrant or reckless or grossly negligent misconduct.

## CONCLUSION

Being fully advised, it is **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress [ECF No. 20] is **DENIED**.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 9th day of August 2022.

_____
AILEEN M. CANNON
UNITED STATES DISTRICT JUDGE

cc: counsel of record